# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

In the Matter of: Highland Capital Management, L.P.,

Debtor,

Highland Capital Management, L.P.,

Appellee,

v.

NexPoint Asset Management, L.P., formerly known as Highland Capital Management Fund Advisors, L.P.; NexPoint Advisors, L.P.; NexPoint Real Estate Partners, L.L.C., formerly known as HCRE Partners L.L.C.; Highland Capital Management Services, Incorporated; James Dondero,

Appellants.

_____

In the Matter of: Highland Capital Management, L.P.,

Debtor,

James D. Dondero,

Appellant,

v.

Highland Capital Management, L.P.,

Appellee.

Appeal from the United States District Court for the
Northern District of Texas, the Honorable Brantley Starr
Civ. Act. No. 3:21-cv-00881-X

CORE/3522697.0002/185613231.17

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

In the Matter of: Highland Capital Management, L.P.,

Debtor,

Highland Capital Management, L.P.,

Appellee,

v.

NexPoint Asset Management, L.P., formerly known as Highland
Capital Management Fund Advisors, L.P.,

Appellant.

Appeal from the United States District Court for the
Northern District of Texas, the Honorable Brantley Starr
Civ. Act. No. 3:21-cv-00881-X

## APPELLANTS' OPENING BRIEF

Deborah Deitsch-Perez, Esq.
Michael Aigen, Esq.
**STINSON LLP**
2200 Ross Avenue, Suite 2900
Dallas, TX 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
**ATTORNEYS FOR APPELLANTS**

Davor Rukavina
Julian P. Vasek
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
**ATTORNEYS FOR APPELLANTS
NEXPOINT ASSET MANAGEMENT,
L.P. (F/K/A HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P.) and NEXPOINT ADVISORS, L.P.**

# CERTIFICATE OF INTERESTED PERSONS

Appellants certify that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal:

1) <u>Appellee</u>:

   Highland Capital Management, L.P.

2) <u>Counsel for Appellee</u>:

   Jeffrey N. Pomerantz (CA Bar No. 143717)
   John A. Morris (NY Bar No. 2405397)
   Gregory V. Demo (NY Bar No. 5371992)
   Hayley R. Winograd (NY Bar No. 5612569)
   PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA 90067

   -and-

   Melissa S. Hayward (Texas Bar No. 24044908)
   Zachery Z. Annable (Texas Bar No. 24053075)
   HAYWARD PLLC
   10501 N. Central Expy., Ste. 106
   Dallas, Texas 75231

3) <u>Appellants filing this brief</u>:

   NexPoint Asset Management, L.P., formerly known as Highland Capital Management Fund Advisors, L.P.;

   NexPoint Advisors, L.P.;

   NexPoint Real Estate Partners, L.L.C., formerly known as HCRE Partners L.L.C.;

i

Highland Capital Management Services, Incorporated; and

James Dondero

4)      Counsel for Appellants:

Deborah Deitsch-Perez, Esq.
Michael Aigen, Esq.
**STINSON LLP**
2200 Ross Avenue, Suite 2900
Dallas, TX 75201

-and-

Davor Rukavina
Julian P. Vasek
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790


By: */s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez, Esq.

CORE/3522697.0002/185613231.17

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns an oral agreement to forgive certain promissory notes upon the fulfillment of certain conditions. The Bankruptcy Court improperly ignored Fifth Circuit precedent when it weighed the credibility of evidence and substituted its own judgment for that of a jury's. Appellants respectfully request that the Court grant oral argument in this appeal.

CORE/3522697.0002/185613231.17

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

I.    STATEMENT OF JURISDICTION .............................................................1

II.   STATEMENT OF THE ISSUES ..................................................................1

ISSUE NO. 1: ...........................................................................................................1

ISSUE NO. 2: ...........................................................................................................2

ISSUE NO. 3: ...........................................................................................................2

ISSUE NO. 4: ...........................................................................................................2

ISSUE NO. 5: ...........................................................................................................2

ISSUE NO. 6: ...........................................................................................................3

III.  STATEMENT OF THE CASE ....................................................................3

    A.    Appellee Agreed to Forgive Notes upon Fulfilment of Conditions Subsequent................................................................................3

        1.    Appellants Provide Declarations Showing that Utilizing Forgivable Loans as Compensation was a Practice at Highland. ...................................................................................7

        2.    The LPA Does Not Prohibit the Agreements. ...........................8

        3.    James and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements. .........9

        4.    Dugaboy Was Entitled to Make the 2014 Agreement Regardless of Who Was Trustee. .............................................10

        5.    James Dondero's Declaration Does Not Contradict His Deposition Testimony, But Instead Clarifies It. .......................12

        6.    The Dondero Declarations Are Not Conclusory, Internally Inconsistent, or Self-Contradictory. .........................15

    B.    Appellee was Responsible for Making Term Note Payments under Shared Services Agreements with NexPoint, HCMS, and NPREP....17

        1.    The NexPoint Shared Services Agreement................................18

        2.    The HCMS and NPREP Shared Services Agreements.............20

CORE/3522697.0002/185613231.17

C.      Prepayment on the Term Notes ...........................................22

    1.    NexPoint's Prepayments ...........................................22

    2.    HCMS's Prepayments ..............................................24

**IV.**   SUMMARY OF ARGUMENT ...................................................25

**V.**   ARGUMENTS AND AUTHORITIES .......................................29

A.      The Dondero Declarations Should Not Be Stricken Because They Are Not Conclusory, Self-Serving, or Self-Contradictory .................29

    1.    The Dondero Declarations Are Not Conclusory or Self-Serving Under Texas Law. ....................................29

    2.    The Dondero Declarations Are Not Self-Contradictory or Internally Inconsistent. ..............................................32

    3.    James Dondero's Declaration Clarifies His Prior Deposition Testimony Rather Than Contradicts It. .....................................35

    4.    James Dondero's Declaration's Minor Inconsistency with the Answer Does Not Render the Dondero Declarations Invalid. ..........................................................36

B.      The Evidence Shows the Agreements Exist. ......................................41

    1.    James Dondero Not Declaring the Notes "Forgiven" upon the Sale of a Small portion of HCM's MGM Shares is Not Probative of Whether the Agreements Exist. ............................42

    2.    Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence. ...................43

    3.    The Agreements Are Definite and Supported by Consideration and a Meeting of the Minds. ..............................48

    4.    Nancy Dondero was Legally Competent to Cause Appellee to Enter into the Agreements. ..................................51

C.      The Bankruptcy Court's Conclusion that Nancy Dondero Did Not Have Authority to Bind Appellee Under the LPA is Inconsistent with the LPA. ..........................................................52

D.      Appellee's Negligence and Fault in Creating an Alleged Default ......53

E.      Prepayments by NexPoint and HCMS. .............................................54

    1.    NexPoint Prepayments ...........................................55

    2.    HCMS Prepayments ..............................................61

    3.    The Reports Fail to Address the Issue of Prepayment .............64

F.    There Were Genuine Issues of Material Fact Precluding Entry of Summary Judgment Against NAM. .....................................................65

    1.    Summary of NAM's Argument. ................................................65

    2.    The Material Disputed Facts – and the Denial of the Motion to Amend. ...................................................................................66

        a.    Waterhouse Did Not Sign the Notes .............................66

        b.    Waterhouse Lacked Authority to Execute the Notes .....68

        c.    The NAM Notes Are the Result of a Mutual Mistake ...69

VI.    CONCLUSION. ..............................................................................81

CORE/3522697.0002/185613231.17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*,
584 S.W.3d 53 (Tex. App. 2018)......................................................48

*271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*,
03-07-00498-CV, 2008 WL 2387630 (Tex. App.—Austin June 11,
2008) ..............................................................................................46

*Admiral Ins. Co. v. Armani*,
No. 3:12-CV-105-N, 2012 WL 12885095 (N.D. Tex. Dec. 19,
2012) ..............................................................................................69

*Al-Saud v. Youtoo Media, L.P.*,
3:15-CV-3074-C, 2017 WL 3841197 (N.D. Tex. Mar. 15, 2017) ..............26, 43

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986)........................................................................52

*Bacher v. Maddux*,
550 S.W.2d 405 (Tex. App. 1977)....................................................55

*Bargher v. White*,
928 F.3d 439 (5th Cir. 2019) ....................................................30, 31

*Breof BNK Texas, L.P. v. D.H. Hill Advisors, Inc.*,
370 S.W.3d 58 (Tex. App. 2012)......................................................69

*Brown v. Jackson*,
40 S.W. 162 (Tex. Civ. App. 1897)..................................................48

*Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*,
297 S.W.3d 248 (Tex. 2009) ............................................................54

*Clark v. W. Chem. Products, Inc.*,
557 F.2d 1155 (5th Cir. 1977) ........................................................28

*Cooper Cameron Corp. v. United States Dep't of Labor*,
280 F.3d 539 (5th Cir. 1996) ............................................32, 33, 35

CORE/3522697.0002/185613231.17

*Craig Sessions M.D., P.A. v. TH Healthcare Ltd.*
412 S.W.3d 738 (Tex. App. 2013).....................................................55

*Curry v. City of Syracuse*,
316 F.3d 324 (2d Cir. 2003) ...............................................38

*Curry v. O'Daniel*,
102 S.W.2d 481 (Tex. App. 1937).....................................................55

*Dartez v. Owens-Illinois, Inc.*,
910 F.2d 1291 (5th Cir. 1990) ...............................................38

*In re Davenport*,
522 S.W.3d 452 (Tex. 2017) ...............................................52

*DeWitt County Elec. Coop. Inc. v. Parks*,
1 S.W.3d 96 (Tex. 1999).....................................................54

*Dorsett v. Hispanic Hous. & Educ. Corp.*,
389 S.W.3d 609 (Tex. App.—Houston [14th Dist.] 2012) ...............................25

*Envtl. Conservation Org. v. City of Dallas, Tex.*,
529 F.3d 519 (5th Cir. 2008) ...............................................25

*Figueroa v. Mazza*,
825 F.3d 89 (2d Cir. 2016) ...............................................35

*First Com. Bank v. Palmer*,
226 S.W.3d 396 (Tex. 2007) ...............................................48

*First Nat'l Bank in Dallas v. Whirlpool Corp.*,
517 S.W.2d 262 (Tex. 1974) ...............................................59

*Fisher v. Blue Cross and Blue Shield of Tex., Inc.*,
3:10-CV-2652-L, 2015 WL 5603711 (N.D. Tex. Sept. 23, 2015)...............44, 45

*Franklin v. Regions Bank*,
CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021)...............................45

*Freeman v. City of Fort Worth, Texas*,
2011 WL 2669111 (N.D. Tex. July 7, 2001)...............................32, 35

CORE/3522697.0002/185613231.17

*GAF Corp. v. Bamber*,
    29 S.W.3d 650 (Tex. App.—Beaumont 2000) ....................................................9

*Gaines v. Kelly*,
    235 S.W.3d 179 (Tex. 2007) ...............................................................................68

*Garcia v. Lumacorp, Inc.*,
    No. CIV.A. 3:02-CV-2426, 2004 WL 1686635 (N.D. Tex. July 27,
    2004), aff'd, 429 F.3d 549 (5th Cir. 2005) .........................................................49

*Getto v. Gray*,
    627 S.W.2d 437 (Tex. App. 1981)........................................................................55

*Gulbenkian v. Penn.*,
    151 Tex. 412, 252 S.W.2d 929 (1952) .................................................26, 28, 35

*Gunville v. Gonzales*,
    508 S.W.3d 547 (Tex. App.—El Paso 2016) ....................................................29

*Guzman v. Allstate Assurance Co.*,
    18 F.4th 157 (5th Cir. 2021) ...............................................................................63

*Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*,
    480 S.W.2d 607 (Tex. 1972) .....................................................................20, 43

*Haygood v. De Escabedo*,
    356 S.W.3d 390 (Tex. 2011) ...............................................................................72

*Heinsohn v. Carabin & Shaw, P.C.*,
    832 F.3d 224 (5th Cir. 2016) ...............................................................................63

*Hoard v. McFarland*,
    229 S.W. 687 (Tex. App. 1921), *writ refused* (June 7, 1922) ...........................48

*Honore v. Douglas*,
    833 F.2d 565 (5th Cir. 1987) ...............................................................................46

*Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*,
    136 F. Supp. 3d 792 (S.D. Tex. 2015).................................................................36

*Katy Int'l, Inc. v. Jinchun Jiang*,
    451 S.W.3d 74 (Tex. App. 2014).........................................................................48

ix

*Kenneth-Murray Corp. v. Bone*,
  622 F.2d 887 (5th Cir. 1980) ............................................................38

*Kirkindoll v. NCUA Bd.*,
  Civil Action No. 3:11-CV-1921-D, 2015 U.S. Dist. LEXIS 47930
  (N.D. Tex. April 13, 2015) ...............................................................68

*LegacyRG, Inc. v. Harter*,
  705 F. App'x 223 (5th Cir. 2017) .................................................26, 27

*Lester v. Wells Fargo Bank, N.A.*,
  805 Fed. Appx. 288 (5th Cir. 2020)...................................................29

*Marx v. FDP, LP*,
  474 S.W.3d 368 (Tex. App. 2015)......................................................48

*Mays v. Dir. Office of Workers' Comp. Programs*,
  938 F.3d 637 (5th Cir. 2019) .......................................................37, 40

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*,
  907 S.W.2d 517, 520 (Tex. 1995) ......................................................54

*Nicholson v. Securitas Sec. Servs. USA, Inc.*,
  830 F.3d 186 (5th Cir. 2016) .............................................................40

*O'Connor v. United States*,
  479 U.S. 27 (1986).............................................................................55

*In re Palms at Water's Edge, L.P.*,
  334 B.R. 853 (Bankr. W.D. Tex. 2005)........................................43, 44

*Parrish v. Haynes*,
  62 F.2d 105 (5th Cir. 1932) ...............................................................59

*Phillips v. Herdon*,
  14 S.W. 857 (Tex. 1890)...............................................................59, 60

*Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*,
  810 F.3d 940 (5th Cir. 2015) .............................................................26

*Reeves v. Sanderson Plumbing Prod., Inc.*,
  530 U.S. 133, 120 S. Ct. 2097 (2000)................................................26

x

*Roark v. Stallworth Oil and Gas, Inc.*,
  813 S.W.2d 492 (Tex. 1991) ............................................................50

*Samuel v. Holmes*,
  138 F.3d 173 (5th Cir. 1998) ...........................................................25

*Souther Equip. Sales, Inc. v. Ready Mix Sols., LLC*,
  No. 05-17-01176-CV, 2018 WL 3454801 (Tex. App. July 18,
  2018) ..............................................................................................48

*Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*,
  673 F.3d 399 (5th Cir. 2012) ...........................................................69

*Texas Co. v. Schram*,
  93 S.W.2d 544 (Tex. App. 1936)......................................................59

*Thomson v. Washington*,
  362 F.3d 969 (7th Cir. 2004) ...........................................................37

*Tyler v. Cedar Hill Indep. Sch. Dist.*,
  426 Fed. Appx. 306 (5th Cir. 2011)...........................................30, 31

*Vaughan v. Crown Plumbing & Sewer Serv., Inc.*,
  523 S.W.2d 72 (Tex. App. 1975).....................................................62

*W.E. Grace Mfg. Co. v. Levin*,
  506 S.W.2d 580 (Tex. 1974) ...........................................................59

*Whatley v. Armstrong World Inds., Inc.*,
  861 F.2d 837 (5th Cir. 1988) .....................................................37, 38

*Williams v. Cambridge Cos.*,
  615 S.W.2d 172 (Tex. 1981) ...........................................................55

*Yaquinto v. Segerstrom (In re Segerstrom)*,
  247 F.3d 218 (5th Cir. 2001) ...........................................................25

**Statutes**

28 U.S.C. § 158(d) ..................................................................................1

28 U.S.C. § 1291 ....................................................................................1

Tex. Bus. & Com. Code § 3.401(a)........................................................66

xi

TEX. BUS. & COM. CODE § 3.402(a)..........................................................................68

**Other Authorities**

The New Federal Rules of Civil Procedure: The Last Phase –
    Underlying Philosophy Embodied in Some of the Basic Provisions
    of the New Procedure, 23 A.B.A.J. 976, 977 (1937) .........................................37

14 Tex. Jur. 3d Contracts § 157 (2024) ............................................................48, 49

3 Williston on Contracts § 7:44 (4th ed. 2009)......................................................48

CORE/3522697.0002/185613231.17

## APPELLANTS' OPENING BRIEF

Appellants NexPoint Asset Management, L.P., formerly known as Highland Capital Management Fund Advisors, L.P. ("NAM"); NexPoint Advisors, L.P. ("NPA"); NexPoint Real Estate Partners, L.L.C., formerly known as HCRE Partners L.L.C. ("NPREP"); Highland Capital Management Services, Incorporated ("HCMS"); and James Dondero ("Dondero") (collectively "Appellants"), submit this opening brief, in support of which they state as follows:

## I.     STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because it is an appeal from final judgments of the District Court, sitting as bankruptcy appellate court pursuant to 28 U.S.C. § 158(d). The Bankruptcy Court issued two reports (the "Reports"), both recommending that the District Court grant summary judgment, which it did in orders adopting the Reports without any further analysis. The District Court subsequently entered separate Amended Final Judgments against each Appellant. Appellants timely appealed. The six appeals were consolidated by this Court.

## II.    STATEMENT OF THE ISSUES

## ISSUE NO. 1:

Whether the District Court, sitting as a bankruptcy appellate court, correctly adopted the Bankruptcy Court's rulings that there were no material issues of fact precluding summary judgment.

CORE/3522697.0002/185613231.17

**ISSUE NO. 2:**

Whether the Bankruptcy Court (and, subsequently, the District Court) improperly utilized its own judgment and disregarded testimony and evidence and improperly made credibility determinations concerning witness testimony and the relative weight of Appellants' versus Appellee's evidence in support of its decisions to grant summary judgment.

**ISSUE NO. 3:**

Whether the District Court and the Bankruptcy Court disregarded the rule that all summary judgment evidence must be viewed in a light most favorable to the non-movant.

**ISSUE NO. 4:**

Whether the Bankruptcy Court failed to credit Appellants' evidence that shared service agreements between the parties required Appellee to make term note payments and that, therefore, Appellee could not fail to make payments and then claim defaults.

**ISSUE NO. 5:**

Whether the Reports inaccurately stated that Appellants' evidence that certain notes were not prepaid was "unrefuted," ignoring both testimonial and documentary evidence that they were prepaid.

CORE/3522697.0002/185613231.17

**ISSUE NO. 6:**

Whether the Bankruptcy Court properly rejected Appellant NAM's mutual mistake defense as "unsubstantiated," when in fact there was considerable evidence that the intercompany transfers at issue were intended to reimburse expenses caused by Appellee's negligence, not loans.

## III.   STATEMENT OF THE CASE

### A.   Appellee Agreed to Forgive Notes upon Fulfilment of Conditions Subsequent.

Appellee seeks to enforce over $50 million of promissory notes issued to Appellee by Appellants that were to be forgiven as compensation to James Dondero, at the time an executive of Appellee and Appellants, if certain conditions occurred. While the Bankruptcy Court calls it "bizarre," the Highland Capital Limited Partnership Agreement (the "LPA") authorized the "Majority Interest" to approve compensation for the General Partner and Affiliates of the General Partner.[1]   The LPA identifies the Dugaboy Investment Trust ("Dugaboy") as the Majority Interest in charge of approving compensation.[2]   James Dondero, the founder of Appellee

---

[1] *See* **ROA-75194**. Specifically, § 3.10(a) of the LPA provides: "(a) <u>Compensation</u>.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements *unless approved by a Majority Interest.*" **ROA-69906** (emphasis added).

[2] The LPA defines the relevant actors in the Compensation provision as follows: "**'Majority Interest'** means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners." *Id.*, § 2.1, **ROA-69896**; "**'Class A Limited Partners'** means those Partners holding a Class A Limited Partnership Interest, as shown on <u>Exhibit A</u>." *Id*., § 2.1, **ROA-69894**; and Exhibit A reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.  *Id.*, **ROA-69923** at line 5.

HCMLP, served as Dugaboy Trustee from October 2010 to August 2015, as has Nancy Dondero from October 14, 2015, to the present.[3] Thus, Dondero represented the "Majority Interest," and was the individual entitled to approve compensation under the LPA when the 2014 Agreement (defined below) was made, and Nancy Dondero was the individual entitled to approve compensation under the LPA when the other agreements described below were made.

Appellee issued two demand promissory notes to NAM, one in 2014 and one in 2016 (the "NAM Demand Notes").[4] Appellee also issued three demand promissory notes (the "Dondero Demand Notes") to James Dondero in 2018. Appellee also issued one promissory note payable on a term schedule to Highland Capital Management Services, Inc. ("HCMS") in 2017 (the "HCMS Term Note"), and four demand promissory notes to HCMS in 2019 (the "HCMS Demand Notes"). Appellee also issued one promissory note payable on a term schedule with NexPoint Advisors, L.P. ("NexPoint"), on May 31, 2017 (the "NexPoint Term Note"). Appellee also issued five promissory notes payable on demand and one promissory note payable on a term schedule with HCRE Partners, LLC n/k/a/ NexPoint Real Estate Partners, LLC ("HCRE"), between November of 2013 and October of 2018

---

[3] **ROA-74883-74884, 74892-74896**.
[4] *See* **ROA-74882-74883** at ¶¶ 5-6.

CORE/3522697.0002/185613231.17

(the "HCRE Demand Notes" and the "HCRE Term Note") (collectively, the "Notes").

In late 2014/early 2015, Dondero – on behalf of Appellant NAM and on behalf of Appellee as representative for a majority of Class A shareholders at that time – entered into an agreement that Appellee would forgive the 2014 NAM Note upon the fulfilment of certain conditions subsequent (the "2014 Agreement").[5] Specifically, if certain portfolio companies were sold for greater than cost – namely, Trussway, Cornerstone, or MGM – the Notes would be forgiven.[6] In late 2016/early 2017, subsequent Trustee Nancy Dondero entered into an identical agreement subsequent to the issuance of the 2016 Note.[7]

In late 2017/early 2018 (i.e., around the time Highland set bonuses for the prior period and compensation for the upcoming period), Nancy Dondero – on behalf of Appellee as the representative for a majority of Class A shareholders – entered into an agreement with James Dondero that Appellee would forgive the Notes issued in 2017 upon the same conditions subsequent. They entered into identical agreements in 2018, 2019, and 2020, respectively for the Notes issued in the immediately preceding compensation periods. The agreements are collectively referred to as the "Agreements."

---

[5] **ROA-74885** at ¶ 13.

[6] *Id.*

[7] **ROA-74886** at ¶ 15.

CORE/3522697.0002/185613231.17

The Agreements benefitted Appellee on two fronts. First, Dondero forwent opting to increase his own salary with cash compensation in accordance with § 3.10 of the LPA, as he would have been allowed to do.[8] Instead, Dondero elected to make his potential compensation conditional upon his own successful performance, and Appellee benefitted from the Agreements by not paying Dondero higher base compensation, something Dondero thought was "great for the [Appellee] at the time," and "reduces other compensation [that he would have otherwise taken]." [9] Second, the Agreements served as an incentive for Dondero to work particularly diligently on the sale of the portfolio companies and to make sure they were successful.[10] This incentive benefitted Appellee by maintaining its profitability and reputation across the industry for successful performance as a private equity firm.[11] The Agreements acted to motivate and retain Dondero as Appellee's employee.[12] In sum, Appellee benefited from the Agreements by: (i) not paying Dondero a higher base compensation, and (ii) receiving more focused and dedicated work from Dondero.

---

[8] **ROA-74885** at ¶ 13.
[9] **ROA-70944** at 182:2-18**, 74885** at ¶ 13.
[10] *Id.*
[11] **ROA-74885** at ¶ 13.
[12] *Id.*

CORE/3522697.0002/185613231.17

1. **Appellants Provide Declarations Showing that Utilizing Forgivable Loans as Compensation was a Practice at Highland.**

The Appellee's use of forgivable loans as compensation is certainly a disputed fact in this case, despite the Reports labeling it otherwise.[13] Contrary to the Reports and Appellee's assertion that "[Appellee] did not have a 'practice' of forgiving loans," it was not uncommon for Appellee to provide executives with forgivable loans as compensation.[14] Along with Dondero, several of Appellee's executives received loans that were forgiven, including Michiel Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery.[15] Appellants provided a sworn declaration from Michiel Hurley – an executive who founded Incline Capital ("Incline") – who personally benefitted from a loan forgiven by NAM.[16] Hurley testified that Defendant NAM (through Dondero) loaned Incline $435,000 when Incline was experiencing financial hardship, and Defendant NAM *later forgave that amount* in 2013.[17] Because Hurley was the founder and owner of Incline, that debt-forgiveness benefitted Hurley individually.[18]

---

[13] **ROA-75177**.

[14] **ROA-69186** at ¶ 95; *see also* **ROA-75177**; **ROA-74884** at ¶ 11; **ROA-71061** at 424:4-8.

[15] **ROA-74884** at ¶ 11; **ROA-69810**; **ROA-72438** at 109:7-22; **ROA-72492** at 106:6-22; **ROA-71295** at 212:4-25.

[16] **ROA-74961** at ¶¶ 5-7.

[17] *Id*.

[18] *Id*. at ¶ 7.

CORE/3522697.0002/185613231.17

Appellee's own corporate representative, James Seery, confirmed that several of the above-named individuals (including Hurley) received loans that were forgiven in the past.[19] Using forgivable loans to compensate Dondero made sense for Appellee, as he was undercompensated in his position compared to other similarly-situated contemporaries at comparable investment firms.[20] The Reports' characterization of this issue as "undisputed" is false.

## 2. The LPA Does Not Prohibit the Agreements.

The Reports adopt Appellee's broad and inaccurate assertion that "[t]he [] Agreements were not authorized under the [LPA][,]"[21] contending that "the Limited Partners only have authority to approve agreements for compensation, not to execute them[,]" citing § 3.10(a) of the LPA.[22]

But even the narrowest reading of § 3.10(a) uncovers no restriction on Limited Partners to "execute" any agreement. Rather, the LPA authorizes, indeed requires, the Majority Interest to approve compensation agreements, and only the Majority Interest's approval is required.[23] The Bankruptcy Court's interpretation of § 3.10(a) would effectively render that provision useless. That is, if the Majority Interest has

---

[19] **ROA-71266** at 94:21-96:22; **ROA-74719-74720** at 177:19-178:5.

[20] **ROA-74884** at ¶ 11; **ROA-71282** at 160:10-161:3; **ROA-71297-71298** at 218:12-222:14; **ROA-74771** at 24:7-25:4 (providing expert testimony that the Agreements did not create taxable income for Dondero).

[21] **ROA-69183-69184** at ¶ 89; *see also* **ROA-75194-75195**.

[22] *Id.*

[23] **ROA-69906** at § 3.10(a).

CORE/3522697.0002/185613231.17

the right but not the authority to approve compensation, then § 3.10(a) would serve no function at all. "[Courts] must try to give effect to ***all contract provisions*** so that none will be rendered meaningless. We consider each part with every other part and presume the parties intend every clause to have some effect. And we strive to ***give meaning to every clause to avoid rendering any portion meaningless***."[24] Accordingly, the Bankruptcy Court's interpretation of § 3.10(a) cannot be correct and the LPA authorized Dugaboy to enter into the Agreements on behalf of Appellee.[25]

### 3. James and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements.

Throughout this litigation, Appellee has taken the position that the Agreements are fabricated and lack any evidence of their existence.[26] However, James and Nancy Dondero have consistently testified under oath that the Agreements took place, exist, and are valid.[27] Further, both James and Nancy Dondero have provided declarations swearing to the Agreements' existence.[28] The declarations and deposition testimony of James and Nancy Dondero demonstrate

---

[24] *GAF Corp. v. Bamber*, 29 S.W.3d 650, 653 (Tex. App.—Beaumont 2000, pet. dism'd) (internal citations omitted) (emphasis added).

[25] *Id.*

[26] **ROA-69179-69180** at ¶¶ 76-78.

[27] **ROA-71199** at 162:22-163:8; **ROA-70943** at 176:20-177:5; **ROA-74885-74886** at ¶¶ 13-15; **ROA-74655-74663**.

[28] **ROA-74885** at ¶ 13, **ROA-74592** at ¶ 24; **ROA-74951** at ¶ 7, **ROA-74659** at ¶ 6.

9

that the Agreements exist, and Appellee's assertion that "no reasonable trier of fact can find that the [] Agreement[] existed" is inconsistent with the summary judgment evidence.

**4.    Dugaboy Was Entitled to Make the 2014 Agreement Regardless of Who Was Trustee.**

Dondero was not "forced to change his tale again" when he recalled during live testimony that he entered into the 2014 Agreement as the Dugaboy Trustee.[29] While opposing counsel questioned Dondero about an Agreement that occurred more than seven years ago, Appellee points to Dondero's testimony that:

> Q:    Okay.  So is it fair to say that paragraph 41 [of the Original Answer] is not accurate to the extent that it states or suggests that Nancy Dondero entered into the [2014 Agreement]?
>
> A:    .  .  .  .  .   I can't recall the 2014 note being prior to the 2016 discussion or not or if – this 2014 [note] was a small note; so was [the] 2016 [note] for that matter.  I can't – I can't remember if she would have been involved in the '14 note … or [if] the '14 note was part of the 2016 conversation.[30]

Opposing counsel's contrived efforts to portray Dondero as changing his narrative for the 2014 Agreement "at the last second" fail because Dondero had already clarified the identity of the parties to the 2014 Agreement just minutes earlier at the same deposition:

---

[29] **ROA-69186** at ¶ 97.
[30] **ROA-74974** at 33:5-18.

CORE/3522697.0002/185613231.17

Q: Having seen – having scrolled through at least the portion of the answer prior to the affirmative defenses, are you aware of anything that is inaccurate in any way in HCMFA's answer?

A: I – not specifically … other than, as I note below, I was the Dugaboy Trustee in 2014, not Nancy, and so I spoke for Highland re the agreement regarding the 2014 note.[31]

Here, Dondero recalled that it was *himself*, not Nancy Dondero, that served as Dugaboy Trustee in 2014 just moments prior to the quote Appellee cited in its motion. Thus, the adequacy of Dondero's recollection of who served as Dugaboy Trustee seven years ago does not affect the existence of the 2014 Agreement, especially because Nancy Dondero not only recalled the 2016 Agreement, but also that James told her about the 2014 Agreement when they discussed the 2016 Agreement, explaining why Mr. Dondero's recollections about events so many years ago would not be as sharp.[32]

Further, Dondero provided the Court with declaration testimony disputing Appellee's characterization of Dondero's refreshed memory as some type of contrived ruse devised to mislead the Court:

14. I understand that [Appellee] takes issue with the fact that I recently remembered that I was actually the Dugaboy Trustee when the 2014 Agreement was made, characterizing my recollection as some kind of last-second surprise revelation. I simply did not think about the exact time frame during which I was the Dugaboy Trustee until around the

---

[31] **ROA-74973** at 29:6-13; **ROA-74987** at Line 7.

[32] **ROA-75004** at 22:12-23:4 (when we had a conversation in '16, he would have brought up the note in '14 that was also to be forgiven upon the condition subsequent).

CORE/3522697.0002/185613231.17

time of my deposition on May 5, 2022 – about seven years after the 2014 Agreement was made.[33]

This fact was no surprise to Appellee because it possessed the documents – that were on the Highland server and produced in litigation – showing who the Dugaboy Trustee was at each time period.[34] Appellee's attempt to bolster its motion based on small conflicts in recollections of events many years prior is unavailing because Dondero testified in both his deposition and declaration that he was, in fact, the Dugaboy Trustee for the 2014 Agreement. Moreover, Appellee's reliance on this sort of credibility attack only underscores the inappropriateness of the Bankruptcy Court's grant of summary judgment on this contested fact issue.

### 5. James Dondero's Declaration Does Not Contradict His Deposition Testimony, But Instead Clarifies It.

The Reports purport to justify summary judgment stating that "Mr. Dondero's declaration evidence . . . contradicts [his] prior deposition testimony . . . that (a) the Pre-2019 Notes were issued in exchange for loans made to HCMFA, and (b) the [Agreements] were entered into ten to twelve months after each of the Pre-2019 Notes were issued,"[35] listing citations to Dondero's May 5, 2022 deposition – often inapplicable to the Reports' assertion – in an effort to carefully manipulate the

---

[33] **ROA-74885** at ¶ 14.

[34] **ROA-74891-74896**; **ROA-74666-74667**; **ROA-74610-74650**; **ROA-71164** at 22:13-15; **ROA-71055** at 400:8-19.

[35] **ROA-75187**.

testimony to appear contradictory to Dondero's Declaration.[36]  However, the relevant deposition citations are consistent with Dondero's Declaration.[37]  Further, the Reports ignore the most pertinent testimony:

> Q:    Do you know which individuals entered into any agreement relating to the 2014 Note?  Can you identify the individuals?
>
> A:    ***It would have been me as the trustee at that point in time***, and potentially Nancy as trustee in 2016 could have adjusted the '14 note.

Thus, the Reports' narrative that Dondero was not aware of the individuals or details regarding the 2014 and 2016 Agreements ignores record evidence to the contrary.

The Reports impugn Mr. Dondero's credibility suggesting that his July 2022 declaration  "is inconsistent with and contradicts his November 4, 2022, [sic] and May 5, 2022, deposition testimony"[38] based on his failure to then recollect one of the agreements,[39]

While the Reports attempt to treat Dondero's trouble during one of his numerous grueling depositions remembering specific details about the 2014

---

[36] *See* **ROA-75188-75189**; **ROA-74199-74201** at 15:20-17:11, 17:18-22, **ROA-74223** at  39:7-14 (J. Dondero testifying that a $4mm Note was made to NAM); **ROA-74205-74507** at 21:6-22:8, 22:9-23:11 (Confirming that NAM was bound by James Dondero's signature on the Notes); **ROA-74213-74221** at 29:15-37:8 (confirming that James Dondero was the Dugaboy Trustee for the 2014 Note, and that Nancy Dondero was the Dugaboy Trustee for the 2016 Note).

[37] Compare n.46 to **ROA-74882** at ¶ 5 (confirming that the 2014 Note was for $4mm), and **ROA-74885-74886** at ¶¶ 13,15 (confirming that James Dondero was the Dugaboy Trustee at the time of the 2014 Agreement, and that Nancy Dondero was the Dugaboy Trustee for the 2016 Agreement).

[38] **ROA-75188**.

[39] **ROA-75189** (internal citations to record omitted) (emphases added). Note that it was the Bankruptcy Court who added the italicized bracketed text.

CORE/3522697.0002/185613231.17

Agreement as fatal to his credibility, it is common for witnesses to remember additional details about events when they are not the subject of deposition interrogation. Indeed, Dondero addressed this issue directly in his declaration:

> 14. I understand that Plaintiff takes issue with the fact that I recently remembered that I was actually the Dugaboy Trustee when the 2014 Agreement was made, characterizing my recollection as some kind of last-second surprise revelation. I simply did not think about the exact time frame during which I was the Dugaboy Trustee until around the time of my deposition on May 5, 2022 – about seven years after the 2014 Agreement was made.[40]

In fact, when a witness like Dondero later clarifies additional details of a transaction at issue, it is simply *fodder for cross-examination at trial*. For a judge to opine on this issue at summary judgment is an *impermissible determination of evidentiary credibility*.

The Reports' conclusion, that "the *only* evidence submitted by HCMFA regarding the existence of [the Agreements] are the Dondero [D]eclarations," is inaccurate.[41] In the same deposition the Bankruptcy Court relied on to exclude the Dondero Declarations, Dondero testified:

> Q:     Did Nancy Dondero enter into the agreement that's described in this paragraph [in the Answer explaining the timing and terms of the Agreements] with respect to the 2016 note?
>
> A:     Yes.[42]

---

[40] **ROA-74885** at ¶ 14.
[41] **ROA-75190**.
[42] **ROA-74216** at 32:19-22.

CORE/3522697.0002/185613231.17

This is additional record evidence that the Bankruptcy Court ignores.

> **6.    The Dondero Declarations Are Not Conclusory, Internally Inconsistent, or Self-Contradictory.**

The Reports again make a strained effort to exclude the Dondero Declarations as "conclusory," "internally inconsistent," and "self-contradictory" by parsing the Dondero Declarations' words.[43] The Reports do not specify exactly *how* the Dondero Declarations are conclusory. This is not surprising, as the Dondero Declarations lay out specific facts supporting their assertions. For example, Dondero's declaration fully describes when and how the Notes were made,[44] and also the specific details of the Agreements.[45] Likewise, Nancy Dondero's declaration specifically lays out how she was familiar with Appellee's business,[46] and how the Agreements were reached from her perspective.[47] When read in their entirety, the Dondero Declarations do not simply assert conclusions, but rather provide the reader with *specific facts and details* regarding each of James and Nancy Dondero's professional backgrounds and the context in which the Agreements were made.

---

[43] **ROA-75184** (finding the Dondero Declarations "conclusory" and "self-serving"); **ROA-75190** (finding the Dondero Declarations "internally inconsistent").

[44] **ROA-74882-74883** at ¶¶ 5-6.

[45] **ROA-74884-74886** at ¶¶ 10-16.

[46] **ROA-74949-74950** at ¶¶ 1-5.

[47] **ROA-74950-74952** at ¶¶ 6-12.

15

The Reports' claim that the Dondero Declarations are "internally inconsistent and self-contradictory" is also unsupported.[48] The Reports claim that, because Dondero entered the Agreements on behalf of Appellants, but could have *personally* benefitted via potential compensation, then Dondero was inconsistent about which parties the Agreements were between.[49]  But the Reports fail to acknowledge that Dondero was both a "high-level executive and controlling portfolio manager for . . .[Appellant]," obviously making him a manager *and* employee of Appellant.[50] Neither Appellee nor the Reports present any authority barring a company's manager from benefitting in his or her capacity as an employee from compensation agreements made on behalf of the company (a typical function of any C-suite professional or corporate board of directors/managers member), and Appellants have located none.

The Reports use the same argument for Nancy Dondero's declaration.  The Reports claim that Nancy Dondero entered into the 2016 Agreement on behalf of Appellee with NAM, but understood the 2016 Agreement to be a binding agreement between [Appellee] and Dondero.[51] Again, this completely ignores the fact that Dondero was both an individual *and* a corporate representative capable of binding

---

[48] **ROA-75190**.

[49] **ROA-75191**.

[50] **ROA-74881** at ¶ 4.

[51] *See* **ROA-75192**.

16

the Appellants. Just because Nancy Dondero uses Dondero's name – the man who is also Appellants' representative – does not mean that the 2016 Agreement somehow excluded NAM as a party.[52]

### B. Appellee was Responsible for Making Term Note Payments under Shared Services Agreements with NexPoint, HCMS, and NPREP.

Shared Services Agreements ("SSAs") between Appellee and NexPoint, HCMS, and NPREP provided that Appellee would manage "back and middle office" tasks, which included making debt payments for NexPoint, HCMS, and NPREP.[53] SSAs are common in the private equity industry, and exist to consolidate function and manpower between large and small entities that share overlapping ownership structure.[54]

---

[52] **ROA-74952** at ¶ 12 ("I also intended, believed, and expected that the 2016 Agreement would be a binding and enforceable agreement between HCM and James Dondero.").

[53] **ROA-74594-74597** at ¶¶ 32-39; **ROA-73449-73450** (evidencing responsibilities for back- and middle-office tasks).

[54] **ROA-74594-74595** at ¶ 32. Further, Appellants HCMS, NPREP, and NexPoint filed their *Objection[s] to [the Bankruptcy Court's] Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines* (**ROA-12385-13308**, **ROA-18194-18197**, **ROA-18871-18873**) on January 5, 2021 in this Court. Appellants HCMS, NPREP, and NexPoint objected to the Bankruptcy Court's Order precluding these Appellants from relying on a report from their retained expert, Steven J. Pully (the "Pully Report") who testified, among other things, about typical shared services agreements and how they work. Pursuant to the Bankruptcy Court's Orders, the Pully Report was stricken from Appellants' summary judgment evidence. Appellants reference ROA-01448-01468, which contains the Pully Report, as an offer of proof preserving their objection to the Bankruptcy Court's exclusion of same. *See* **ROA 52178-52179** at ¶¶ 39-44.

### 1. The NexPoint Shared Services Agreement

Under the NexPoint SSA Appellee provided almost the entire workforce for NexPoint,[55] including back- and middle-office, legal compliance, administrative services, and notably "cash management . . . and accounts payable."[56]

The NexPoint SSA required Appellee to "discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."[57]

Further, Kristin Hendrix ("Hendrix") – who served as Appellee's assistant controller in 2020 and is currently employed by Appellee – testified that she knew about the upcoming NexPoint Annual Installment in 2020, but received a phone call from Frank Waterhouse ("Waterhouse") instructing her not to make any payments from the Advisors (which includes NexPoint) to Appellee.[58]

Therefore, Appellee decided on either November 30, 2020 or December 1, 2020 that it was not going to make the annual term payment on the NexPoint Note. However, Appellee never reached out in writing to confirm this with Dondero or

---

[55] **ROA-74594-74597** at ¶ 32; **ROA-73446-73465**.
[56] **ROA-73449-73450**.
[57] **ROA-73457**.
[58] **ROA-72428** at 71:3-20.

CORE/3522697.0002/185613231.17

anyone else at NexPoint, or to inquire about clarification or whether Waterhouse's instruction was a mistake, given the significant consequences of nonpayment. Appellee's inaction was inconsistent with its duties under NexPoint SSA § 6.01's "Standard of Care."[59]

Appellee's characterization of the relationship between Highland and NexPoint under the NexPoint SSA is disputed and inaccurate.[60] Appellee claims that "[n]one of the services [provided for under the NexPoint SSA] authorized Highland to…effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint."[61] However, Appellee made payments for NexPoint in December of 2017, 2018, and 2019 *without any specific authorization, direction, or permission* from Dondero or any other NexPoint executive.[62]

This course of conduct would lead any reasonable person to believe that Appellee would continue to make the annual payments without explicit direction, *as they had done for three years prior.* Appellants believed that Appellee would continue to make the NexPoint Term Note payments, and were surprised to learn that Appellee decided not to make the December 31, 2020 annual payment.[63]

---

[59] **ROA-73457** at § 6.01 (the "Standard of Care" provision); **ROA-52183** at ¶ 51(e).
[60] **ROA-28702-28703** at ¶ 123-126.
[61] **ROA-28702-28703** at ¶ 125.
[62] **ROA-72532-72533**; **ROA-74595** at ¶ 34.
[63] **ROA-74595-74596** at ¶ 35.

CORE/3522697.0002/185613231.17

Whether or not Appellee should have continued to make payments on the NexPoint Note is a genuine issue of material fact. Moreover, Appellee failed to bring certain prepayments to NexPoint's attention, resulting in NexPoint believing that payment was due when it was not, although Appellee now claims it was due, even though it failed to make that payment.[64]

### 2. The HCMS and NPREP Shared Services Agreements

Similar to the NexPoint SSA, Appellee had SSAs with both HCMS (the "HCMS SSA") and NPREP (the "NPREP SSA"), which were both established by oral agreement and course of conduct.[65] Appellee provided identical services to both HCMS and NPREP as it did to NexPoint, and made sure all their financial obligations were promptly paid on time.[66] There was a lengthy history of Appellee providing such services to HCMS and NPREP.[67] The need for these SSAs with HCMS and NPREP were predicated on the fact that both entities – like NexPoint – lacked the internal infrastructure to operate entirely independently.[68] Both HCMS and NPREP heavily relied on Appellee to provide these services, as Appellee had for years prior.[69] Appellee was required to act reasonably in the performance of its

---

[64] See section III.C *infra*.
[65] **ROA-74596-74597** at ¶¶ 36-39.
[66] *Id*.
[67] **ROA-74596-74597** at ¶¶ 36, 38.
[68] **ROA-71038-71039** at 335:14-337:3; **ROA-74596-74597** at ¶¶ 36, 38.
[69] *Id*.

CORE/3522697.0002/185613231.17

obligations to HCMS and NPREP, given the record of past practices and the precedent created by similar work done for NexPoint by Appellee.[70]

Waterhouse confirmed in his deposition that Appellee provided the same services to NPREP and HCMS as it did to NexPoint, including "accounting services, treasury management services, [and] potentially legal services."[71] He also specifically confirmed that loan payments were the "kinds of things that [Appellee] would pay on time because of potential consequences of not paying on time" for HCMS and NPREP.[72]

Further, Hendrix testified that it was "fair to say that [she] [did not] remember any instructions telling [her] not to make any payments from HCMS or HCRE [NPREP],"[73] and that the reason she never made the December 31, 2020 payments on the HCMS or NPREP Term Notes was because she "never got an affirmative instruction to actually make that payment."[74] However, Hendrix later confirmed that Appellee "make[s] payments all the time" without the specific instruction of

---

[70] *See* **ROA-52185** at ¶ 57, p. 851; *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972) (citing 13 Tex.Jur.2d Contracts s 4 (1960); 17 Am. Jur.2d Contracts s 3 (1964); 17 C.J.S. Contracts s 4 (1963)).

[71] **ROA-71421-71422** at 353:3-354:12.

[72] **ROA-71422** at 357:2-11.

[73] **ROA-72435** at 100:20-23.

[74] **ROA-72436** at 101:13-16.

Waterhouse or Dondero.[75] Hendrix made no attempts to determine if Dondero wanted the HCMS or NPREP annual installment payments to be made.[76]

Appellee ultimately knew about but failed to make the December 31, 2020 payments on both the HCMS Term Note and the NPREP Term Note.[77] No one at HCMS or NPREP – including Dondero – directed any person to miss or skip the payments on these Notes.[78] Whether or not Appellee should have continued to make payments on the HCMS Term Note and the NPREP Term Note pursuant to the respective oral SSAs are genuine issues of material fact.[79] Moreover, as discussed in greater detail below, Appellee failed to remind HCMS of prepayments that had been made that relieved it of the obligation to make any additional payment in 2020.

### C. Prepayment on the Term Notes

#### 1. NexPoint's Prepayments

NexPoint asserted the affirmative defense of prepayment on the NexPoint Note, which relieved NexPoint of any obligation to make any additional payment in 2020. Thus, the NexPoint Note was not in default when no payment was made on December 31, 2020. Because there was evidence supporting prepayment, summary judgment striking this affirmative defense was impermissible.

---

[75] *Id.* at 103:10-16.

[76] *Id.* at 102:10-13.

[77] **ROA-74596-74597** at ¶¶ 37, 39.

[78] *Id.*

[79] *See* **ROA-52186** at ¶ 59.

It is undisputed that, between March and August of 2019, the following payments were made on the NexPoint Note (collectively, the "NexPoint Prepayments"): (i) $750,000 on 3/29/2019; (ii) $1,300,000 on 4/16/2019; (iii) $300,000 on 6/4/2019; (iv) $2,100,000 on 6/19/2019; (v) $630,000 on 7/9/2019; and (vi) $1,300,000 on 8/13/2019.[80] These payments totaled $6,380,000 in 2019.[81] The normal December 2019 payment of principal and interest would have been $2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

None of the aforementioned payments were scheduled payments or payments in arrears.[82] Rather, they were prepayments since the Appellee needed money and asked NexPoint to transfer funds for Appellee's liquidity purposes, which NexPoint did.[83] These transfers were intended by both NexPoint and Appellee to be prepayments on the Note.[84] This fact is confirmed by testimony from Appellee's personnel and its amortization schedule for the NexPoint Note.[85] The only dispute here is how these NexPoint Prepayments should have been applied; more

---

[80] **ROA-72533**.

[81] *Id.*

[82] **ROA-74599** at ¶¶ 43-44.

[83] *Id.* at ¶ 42.

[84] *Id.* at ¶ 44.

[85] **ROA-72533**; **ROA-72431** at 81:13-82:3 (objections omitted).

CORE/3522697.0002/185613231.17

specifically, whether they should have been applied to the December 31, 2020 scheduled payment, rendering further payment at that time unnecessary.

### 2. HCMS's Prepayments

Appellee never directly addressed HCMS's prepayment defense. Rather, Appellee listed HCMS in several headings, but then did not made arguments or raise facts specific to HCMS. Moreover, not once in paragraphs 3-14 of Mr. Klos's Declaration addressing the NexPoint prepayment defense (or anywhere else), did Klos mention the HCMS Term Note.[86] Therefore, it does not appear that Appellee even moved for summary judgment on HCMS's prepayment defense. Therefore, granting summary judgment was improper.

There is no factual dispute that between May of 2017 and December of 2020, the HCMS Term Note's principal amount was paid down by almost $14,000,000.00.[87] Between May of 2017 and December of 2020, the following prepayments were made on the HCMS Note (collectively, the "HCMS Prepayments"): (i) $985,216.44 on 6/23/2017; (ii) $907,296.25 on 7/6/2017; (iii) $1,031,463.70 on 7/18/2017; (iv) $1,971,260.13 on 8/25/2017; (v) $1,500,000.00 on 12/21/2017; (vi) $160,665.94 on 5/31/2018; (vii) $1,000,000.00 on 10/8/2018; (viii)

---

[86] **ROA-28585-28587** at ¶¶ 3-14.
[87] **ROA-74599** at ¶ 45; **ROA-74603**.

$1,015,000.00 on 5/5/2019; (ix) $550,000.00 on 8/9/2019; (x) $5,600,000.00 on 8/21/2019; and (xi) $65,360.49 on 12/30/2019.[88]

Again, none of the above payments were scheduled, nor were they ever made on December 31 of any given year.[89] Further, none of these payments were made in arrears.[90] Rather, these prepayments were intended by HCMS to be applied to the scheduled Annual Installment payments, and were obviously accepted as such, since Appellee never declared the note to be in default in 2017, 2018, or 2019.[91]

## IV.  SUMMARY OF ARGUMENT

Appellee's Motion was a "no-evidence" motion, arguing that "there is a complete absence of evidence to support [the Appellants'] . . . affirmative defenses."[92] Therefore, the District Court should have only granted Appellee's Motion if: "(1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more

---

[88] **ROA-74599-74600** at ¶ 45; **ROA-74603**.
[89] **ROA-74600** at ¶ 46; **ROA-74603**.
[90] *Id.*
[91] **ROA-74600** at ¶ 46.
[92] **ROA-69159** at ¶ 3.

CORE/3522697.0002/185613231.17

than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact."[93]

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and ***draw all reasonable inferences in favor of the non-movant***.[94] To determine whether a genuine dispute exists such that the case must be submitted to a jury, courts must also ***refuse to make credibility determinations or weigh the relative strength of the evidence***, and disregard all evidence favorable to the movant that the jury would not be required to believe.[95] By disregarding the Dondero Declarations as "internally inconsistent and self-contradictory[,]" the Bankruptcy Court did what it was patently precluded by the law from doing: it weighed the credibility of summary judgment evidence.

"The duty of the Court hearing [a] motion for summary judgment is to determine if there are any issues of fact to be tried, and not to weigh the evidence or determine its credibility," and "[a]ll doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary

---

[93] *Dorsett v. Hispanic Hous. & Educ. Corp.*, 389 S.W.3d 609, 613 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex. 2005)).

[94] *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008); *Yaquinto v. Segerstrom (In re Segerstrom),* 247 F.3d 218, 223 (5th Cir. 2001); *Samuel v. Holmes,* 138 F.3d 173, 176 (5th Cir. 1998).

[95] *Al-Saud v. Youtoo Media, L.P.*, 3:15-CV-3074-C, 2017 WL 3841197, at 2 (N.D. Tex. Mar. 15, 2017) (citing *Haverda v. Hays County*, 723 F.3d 586, 591 (5th Cir. 2013)) (emphasis added).

judgment."[96] The facts in *LegacyRG* are analogous to the case at bar. In *LegacyRG*, the Fifth Circuit reversed a district court's grant of summary judgment for the employer plaintiff against its former-employee defendant in a compensation dispute case.[97] There, plaintiff claimed that defendant issued himself unauthorized payments above his agreed-to salary, while defendant claimed that the payments were authorized by plaintiff's founder.[98] There, both parties relied on sworn-to declarations: plaintiff claiming that the authorizations for payment never occurred, and defendant claiming that plaintiff directly authorized the payments due to defendant's increased workload.[99] The Fifth Circuit expressly held that the district court erred in granting summary judgment for the plaintiff because "[b]y choosing which testimony to credit and which to discard, '[a] court improperly 'weigh[s] the

---

[96] *Gulbenkian v. Penn.*, 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952) (emphasis added); see also *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000) (Supreme Court reversed judgment because the Court of Appeals concluded that certain circumstances so overwhelmed the evidence favoring petitioner that no rational trier of fact could have found that petitioner was fired because of his age in employment discrimination case. The Court of Appeals impermissibly substituted its judgment concerning the weight of the evidence for the jury's); *LegacyRG, Inc. v. Harter*, 705 F. App'x 223, 230 (5th Cir. 2017) (Fifth Circuit remanded the case because there was a genuine issue of material fact as the district court erred by crediting plaintiff's affidavit and rejecting defendant's. Because the facts contained in each affidavit were critical in each claim, the grant of summary judgment was improper, and a genuine issue of material fact existed); *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 942-43 (5th Cir. 2015) (Fifth Circuit reversed district court's grant of summary judgment because the nonmovant presented a substantial conflict of competent summary judgment evidence).

[97] *LegacyRG, Inc. v. Harter*, 705 F. App'x 223 at 231.

[98] *Id*. at 230.

[99] *Id*.

CORE/3522697.0002/185613231.17

evidence' and resolve[s] disputed issues in favor of the moving party.' Doing so is tantamount to making a credibility determination, and – at this summary judgment stage – a court 'may make no credibility determinations.' Instead a court 'must disregard all evidence favorable to the moving party that the [finder of fact] is not *required* to believe.'"[100]

Here, Appellants offered declarations from ***both sides*** of the Agreements testifying to the Agreements' existence, and Appellee has not offered any declaration ***from anyone* with firsthand knowledge** asserting that the Agreements do not exist. Here, the Bankruptcy Court did not have a declaration to weigh the Dondero Declarations against as the district court in *LegacyRG* did. Indeed, the Bankruptcy Court went a step further than the *LegacyRG* district court by seemingly weighing the Dondero Declarations' credibility against its own interpretation of the facts. The Fifth Circuit has taken a clear stance against district courts even weighing opposing declarations against each other (much less weighing consistent declarations against the court's own suspicions) and deciding which one it believes at summary judgment, as that is an issue for the finder of fact.

"The general rule is that if a motion involves the credibility of affiants or deponents, or the weight of the showings [of fact] or, it is said, a mere ground of

---

[100] *Id.* at 230-231 (internal citations omitted) (emphasis in original).

CORE/3522697.0002/185613231.17

inference, the motion will not be granted."[101] The Fifth Circuit adheres to the high standard that "[t]he burden [at summary judgment] is on the moving party [], to show that there is '*not the slightest doubt* as to the facts and that only the legal conclusion remains to be resolved.'"[102] Because the Bankruptcy Court seemingly completely disregarded Fifth Circuit precedent, this Court must reverse it and the District Court.

## V.    ARGUMENTS AND AUTHORITIES

### A.    The Dondero Declarations Should Not Be Stricken Because They Are Not Conclusory, Self-Serving, or Self-Contradictory.

#### 1.    The Dondero Declarations Are Not Conclusory or Self-Serving Under Texas Law.

The Reports' conclusion that "[t]he only summary judgment evidence submitted by [Appellants] in support of [the Agreements are] conclusory, self-serving, [and] unsubstantiated declarations of Mr. Dondero and his sister, Ms. Dondero" is not supported by the law.[103] The testimony of James and Nancy Dondero states facts,[104] not mere legal conclusions and a "non-conclusory affidavit can create genuine issues of material fact that preclude summary judgment, *even if the affidavit is self-serving and uncorroborated*."[105] That is, "an affidavit based on

---

[101] *Gulbenkian v. Penn.*, 151 Tex. 412 at 417, 252 S.W.2d 929 at 932 (emphasis added).

[102] *Clark v. W. Chem. Products, Inc.*, 557 F.2d 1155, 1157 (5th Cir. 1977) (quoting *Insurance Co. of North America v. Bosworth Const. Co.*, 469 F.2d 166, 1267 (5th Cir. 1972)) (emphasis added).

[103] **ROA-75184**.

[104] *See* factual assertions set forth in Section III.A , *supra*.

[105] *Lester v. Wells Fargo Bank, N.A.*, 805 Fed. Appx. 288, 291 (5th Cir. 2020) (emphasis added) (citing cases).

CORE/3522697.0002/185613231.17

personal knowledge containing factual assertions suffices to create a fact issues, *even if the affidavit is arguably self-serving*."[106] Only "[b]road legal or factual assertions in an affidavit that are ***unsupported by specific facts*** are generally held to be conclusory."[107] For example, if an affiant states that "the consideration for the Agreement was sufficient," that statement would be conclusory, as it does not point to specific facts supporting the assertion. However, if the affiant were to instead state that "the consideration for the Agreement was $100 and a can of Dr. Pepper," the statement is no longer conclusory, as it points to the *specific facts* (i.e., the $100 and the can of Dr. Pepper) showing *why and how* the Agreement was supported by consideration. As described in Section III.A *supra*, James and Nancy's testimony contains factual assertions based on personal knowledge, which, just like the example in the preceding sentence, is not conclusory.

Appellee relies on inapposite authority, *Tyler v. Cedar Hill Indep. Sch. Dist.*, 426 Fed. Appx. 306 (5th Cir. 2011), to support its position that self-serving conclusory affidavits, "without more, will not defeat a motion for summary judgment."[108] In *Tyler*, a *pro se* plaintiff brought suit against her employer (the

---

[106] *Id.* at 291 (quoting *C.R. Pittman Const. Co. v. Nat'l Fire. Ins. Co. of Hartford*, 453 Fed. Appx. 439, 443 (5th Cir. 2011)) (emphasis added).

[107] *Lester v. Wells Fargo Bank, N.A.*, 805 Fed. Appx. 288, 292 (citing *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013)) (emphasis added); *see also Gunville v. Gonzales*, 508 S.W.3d 547, 560 (Tex. App.—El Paso 2016, no pet.) ("A statement is conclusory if it does not provide the underlying facts to support the conclusion.").

[108] **ROA-75035-75036** at ¶ 30.

CORE/3522697.0002/185613231.17

defendant), which breached her own signed settlement agreement in which she released defendant for all causes of action and promised not to sue plaintiff for any action related to her employment.[109] Defendant moved for summary judgment, where Tyler provided *only* a "conclusory, unsworn affidavit, stating that she did not sign the [release][,]" that also failed to explain why she accepted settlement proceeds related to the release.[110] Under those extreme and distinguishable facts, the court granted summary judgment for defendant.

Not surprisingly, the dicta in *Tyler* criticizing the fact that Tyler's affidavit was "self-serving" came under fire by the Fifth Circuit in *Bargher v. White*, 928 F.3d 439, 445 (5th Cir. 2019). The court in *Bargher* made a strong declaration that "[s]imply being 'self-serving,' however, ***does not prevent a party's assertions from creating a dispute of fact***."[111] In reversing a district court that relied upon *Tyler*'s "self-serving" rationale when granting summary judgment, the *Bargher* court provided an apt example: "[a] plaintiff in a car wreck case who asserts that she had a green light and that the defendant ran a red light is also making highly 'self-serving' statements, ***but no one would say that the [court] can ignore them***."[112]

---

[109] *Tyler v. Cedar Hill Indep. Sch. Dist.*, 426 Fed. Appx. at 308-309.

[110] *Id.* at 309 (emphasis added).

[111] *Bargher v. White*, 928 F.3d 439, 445 (emphasis added).

[112] *Id.* (emphasis added).

CORE/3522697.0002/185613231.17

Here, James and Nancy Dondero's affidavits are not remotely conclusory like the affidavit in *Tyler*. James and Nancy Dondero provide specific facts regarding the terms of the Agreements, the Notes that the Agreements applied to, and specific facts regarding when, where, and how the Agreements were entered into.[113] Further, both James and Nancy Dondero provide ***specific facts*** supporting each of their backgrounds that lend themselves to educating the Court regarding why the Agreements were necessary.[114] Because the Dondero Declarations are supported by specific facts as opposed to being full of broad, blanket legal or factual assertions, they are ***not conclusory***. Even if they are mildly self-serving, ***most affidavits are self-serving***, as the Fifth Circuit recognized in *Bargher*.

### 2. The Dondero Declarations Are Not Self-Contradictory or Internally Inconsistent.

The Reports rely on *Cooper Cameron Corp. v. United States Dep't of Labor*, 280 F.3d 539, 550 (5th Cir. 1996) for the proposition that "[a party] cannot meet its [summary judgment] burden with an internally inconsistent, self-contradictory affidavit[.]"[115] However, *Cooper* is inapposite to this case.

In *Cooper* – a case addressing what information the Department of Labor must disclose upon request under the Freedom of Information Act – the Fifth Circuit

---

[113] *See* **ROA-74884-74886** at Section D; **ROA-74951-74952** at ¶¶ 7-9.
[114] *See* **ROA-74881-74885** at ¶¶ 1-12; **ROA-74949-74951** at ¶¶ 1-6.
[115] **ROA-75190**.

overturned a district court's grant of summary judgment due to a patently contradictory declaration.[116] One line of the declaration in question "vaguely state[d] that according to standard procedure, OSHA assured the deponents that their statements would remain confidential."[117]  However, just a few paragraphs prior, the same declaration stated that the declarant "had no idea whether the OSHA inspector provided explicit assurances [that the deponents' statements would remain confidential]."[118] Obviously, *Cooper* dealt with a declaration with an obvious and glaring self-contradiction.  That is not the case here.

Here, the Reports claim an inconsistency in that "the [Agreements] were entered into ten to twelve months after each of the [Notes] were issued in exchange for loans, which contradicts the statement in the declaration (incorporating the Letter and Dondero POC) that the [Notes] were issued 'in lieu of compensation.'"[119]

---

[116] *Cooper Cameron Corp.*, 280 F.3d at 541, 550.  While not included in its "The Dondero Declarations are Internally Inconsistent and Self-Contradictory" section, the Reports appear to rely on another inapposite case in its Legal Standard section regarding self-contradictory affidavits: *Freeman v. City of Fort Worth, Texas*, 2011 WL 2669111 (N.D. Tex. July 7, 2001).  In *Freeman* – a case addressing qualified immunity of police officers under federal statute – the plaintiff (a criminal suspect) submitted a declaration where several sentences were almost immediately contradicted by the next respective sentence.  For example, "[i]n paragraph 4, Freeman testifies that [the police officer] told him to go outside. Subsequently, however, in paragraph 7, Freeman testifies that [the police officer] never asked him to leave the store…" *Id.* at 3.  Just like *Cooper*, *Freeman* is another extreme and inapposite example of self-contradicting affidavits being stricken which has virtually no applicability to this case, other than having convenient sound bites for the Reports to rely upon.

[117] *Cooper Cameron Corp.*, 280 F.3d at 550.

[118] *Id.*

[119] **ROA-75190.**

Obviously, at the time the Notes were issued, they were not "in lieu of compensation." However, once the Agreements were made, they *became potential deferred compensation*. This is not an inconsistency, but instead simply illustrates how the character of the Notes changed after the Agreements were made.

The Reports further attempt to label Dondero's statements in paragraphs 13 and 11 as self-contradictory.[120] The Reports painstakingly split hairs by using the semantics of Dondero's language against him (like counsel would on cross examination *at trial*). The Reports essentially claim that Dondero could not have entered into the Agreements on behalf of NAM because the Agreements benefitted his personal financial position.[121] The idea that Dondero, an employee of NAM, would not have the ability to bind NAM to an agreement regarding his own compensation is also baffling (and unsupported by any authority Appellants have been able to locate).

The Bankruptcy Court focuses on Nancy Dondero's statement that "I also intended, believed, and expected that the 2016 Agreement would be a binding and enforceable agreement between [Appellee] and Dondero – not between [Appellee]

---

[120] **ROA-75191**.

[121] *Id.*, (stating, after a somewhat confusing explanation, that "[i]f the conversations that led to the [Agreements] happened at all, the conversations are alleged to have been between Highland and Mr. Dondero, personally, regarding his personal deferred compensation (which contradicts Mr. Dondero's allegation that he was acting on behalf of, and purporting to bind, [Appellant]) when these alleged conversations occurred.).

CORE/3522697.0002/185613231.17

and [Appellant]," ignoring the fact that Dondero *represented and bound [Appellant] to that Agreement.*[122] Regardless, none of the examples of "internal inconsistency" the Reports rely upon is analogous to the kind of patent inconsistencies that justified summary judgment in the authorities relied upon.

3.     **James Dondero's Declaration Clarifies His Prior Deposition Testimony Rather Than Contradicts It.**

The Reports conclude that, because Dondero did not remember all of the details of the Agreements at his November 4, 2021 and May 5, 2022 depositions, but was able to reflect and recall those same details when writing his declaration, then the declaration is automatically contradictory. That is not so. As discussed *supra*, Section III.A.5-6, Dondero's declaration does not contradict his testimony from a year prior, but rather elaborates upon it. To reference the Reports' own authority discussed immediately *supra*, if Dondero said "there was never a 2014 Agreement" at a deposition, then later claimed "there certainly was a 2014 Agreement" in his declaration – analogous to *Cooper* and *Freeman* – then the Reports' conclusion would make sense. Here, under these facts, it does not. The Reports cite no authority barring a declarant from expounding or elaborating upon prior deposition testimony with an affidavit or declaration. Indeed, "it is permissible [at summary judgment] to clarify by affidavit ***ambiguous or incomplete deposition***

---

[122] *See* **ROA-75192**

CORE/3522697.0002/185613231.17

*testimony*."[123]  Here, Dondero does exactly that: clarifies his prior ambiguous deposition testimony that he was the Dugaboy Trustee during the 2014 Agreement, and outlines the terms of both Agreements. Because declarations are permitted to clarify prior testimony, the Dondero Declarations should not have been stricken.

### 4.  James Dondero's Declaration's Minor Inconsistency with the Answer Does Not Render the Dondero Declarations Invalid.

The Reports opine that the Dondero Declarations "contradict the pleaded facts in [Appellant's] assertion of the [Agreement] Defense in its Answer with respect to the 2014 Note, and therefore will not be considered as competent summary judgment evidence[.]"[124]  Appellee's argument on its face is not a basis for summary judgment because the Court cannot weigh the credibility of evidence at summary judgment.[125] The fact that Dondero recalled that he was the Dugaboy Trustee when the 2014 Agreement was made is immaterial to the 2014 Agreement's existence, and simply because his memory was refreshed at deposition does not change his narrative.  He (as well as Nancy) recalled that when they discussed the 2016 Note and made the 2016 Agreement, they also discussed the 2014 Note and Agreement,[126] leading to some confusion, but ultimately giving additional evidentiary support for the 2014 Agreement. Appellee's proclamation that "the Answer is facially and materially

---

[123] *Figueroa v. Mazza*, 825 F.3d 89, 109, n.15 (2d Cir. 2016).
[124] **ROA-75185**.
[125] *See Gulbenkian v. Penn.*, 252 S.W.2d 929, 931.
[126] **ROA-75004** at 22:12-23:4; **ROA-74974** at 33:5-19.

CORE/3522697.0002/185613231.17

inaccurate" is an issue only for cross-examination, not summary judgment, as it attacks the credibility of a defense.

Moreover, even if the statements were inconsistent, that alone would not justify striking James and Nancy Dondero's sworn testimony. As stated in the case cited in the Reports, "[t]o qualify as a judicial admission [a] statement must be (1) made in a judicial proceeding; (2) contrary to a fact essential to the theory of recovery; (3) deliberate, clear and unequivocal; (4) such that giving it conclusive effect meets with public policy; and (5) about a fact on which a judgment for the opposing party can be based."[127] The Reports make no attempt to argue that the statement contained in Dondero's Answer meets this burden, and apparently *mistakenly assume that any statement contained in a pleading constitutes a judicial admission*.

However, "[a] statement made during the course of a lawsuit – even a statement made in a pleading filed with the court – should be considered a judicial admission only 'if it was made intentionally as a waiver, releasing the opponent from proof of fact.' An *evidentiary* admission, by contrast, 'is merely a statement of assertion or concession made for some independent purpose,' and it may be controverted or explained by the party who made it."[128] The statement contained in

---

[127] *Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*, 136 F. Supp. 3d 792, 821 n.29 (S.D. Tex. 2015).
[128] *Mays v. Dir. Office of Workers' Comp. Programs*, 938 F.3d 637, 647 (5th Cir. 2019) (emphasis in original).

the Answer cannot be construed as such an "intentional[] waiver, releasing [Appellee] from proof of fact." Rather, it was simply an assertion made to provide fair notice – as required under the Federal Rules of Civil Procedure – of Appellant's intent to claim a defense relating to a later agreement not to enforce the Notes upon the occurrence of conditions subsequent. As stated by Charles E. Clark, the "principal draftsman" of the Federal Rules, "[e]xperience has shown . . . that we cannot expect the proof of the case to be made through the pleadings, and that such proof is not really their function. We can expect a general statement distinguishing the case from all others, so that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result."[129] As in *Whatley v. Armstrong World Inds., Inc*., 861 F.2d 837, 839 (5th Cir. 1988), the liberal pleading standard and joinder rules may prevent the use of arguably inconsistent pleadings and discovery as a judicial admission. Indeed, "[p]rocedural context may also prevent the use of admissions of statements made by a party in the trial court."[130] The Reports' eagerness to treat one minor inconsistent statement as a judicial admission is thus contrary to Fifth Circuit precedent.

---

[129] The New Federal Rules of Civil Procedure: The Last Phase – Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A.B.A.J. 976, 977 (1937) (quoted in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 575 (2007) (Stevens, J., dissenting)); *see also Thomson v. Washing*ton, 362 F.3d 969, 970 (7th Cir. 2004) (Posner, J.) ("The federal rules replaced fact pleading with notice pleading.").

[130] *Dartez v. Owens-Illinois, Inc*., 910 F.2d 1291, 1294 (5th Cir. 1990).

Here, the Reports require an unrealistic level of consistency and immediate recall of events that occurred nearly a decade ago in an answer intended to merely provide fair notice of the defenses asserted. "Certainly, every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if is at odds with statements made in an earlier deposition." *Kenneth-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (citation omitted); *id.* at 895 ("While some statements in Bone's deposition differ with those in his affidavit, ***these conflicts present questions of credibility which require jury resolution***.") (emphasis added); *see also Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment. If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."). To the extent that need for clarification was not apparent from the context of Dondero's statement, as mentioned above*, **Dondero explicitly explained the need for this clarification in his declaration**.*[131] The Bankruptcy Court's decision to disregard this explanation

---

[131] **ROA-74885** at ¶ 14.

CORE/3522697.0002/185613231.17

is, again, an improper opinion on credibility, which is inappropriate for a summary judgment ruling.

This is not a typical "sham affidavit" case in which the defendant changes his characterization of facts essential to his claim in response to a motion for summary judgment. Rather, James and Nancy Dondero both clarified the facts contained in the Answer during their depositions, which occurred well before the motion for summary judgment was filed, and Dondero's declaration in response to the motion for summary judgment is consistent with both of the Donderos' previous deposition testimony. The Reports' decision to treat the former, incomplete assertion contained in the Answer as conclusive – and to ignore the latter, consistent discovery responses, depositions, and declaration as a "sham" – appears to be ***nothing more than a conclusion in search of justification***.

As such, this case is controlled by the Fifth Circuit's decision in *Mays*, 938 F.3d at 647-48. In that case, the Fifth Circuit pointed out that, although the defendant had occasionally referred to the plaintiff as an "employee" – including in discovery responses – "when specifically asked during discovery, [the defendant] denied that [the plaintiff] was a borrowed employee." *Id.* at 647. Accordingly, the Court ***refused to treat the defendant's statements as judicial admissions***. *Id.* at 647-48. The *Mays* Court distinguished its prior ruling in *Nicholson v. Securitas Sec. Servs. USA, Inc.*, 830 F.3d 186, 189 (5th Cir. 2016), in which the defendant conceded that

the plaintiff was its employee in a contract, in its answer, and in briefing to the Court, and there were no inconsistent discovery responses. *Id*. As such, the *Nicholson* Court held that the issue was judicially admitted. *Id*. Here, the Answer, discovery responses, deposition testimony, and summary judgment response all consistently attested to the existence of the 2014 Agreement, and at deposition, Dondero testified that he was the Dugaboy Trustee who entered into the 2014 Agreement. The Reports' decision to ignore this overwhelming, consistent evidence is thus contrary to the Fifth Circuit's guidance.

### B. The Evidence Shows the Agreements Exist.

Appellee levied a laundry list of factual contentions against Appellants – some of which the Reports adopt – that it tried to pass of as conclusive proof requiring summary judgment. Appellee argued that ". . . no reasonable trier of fact can find that the [] Agreements ever existed[,]" because: (a) Dondero "failed to declare the [] Notes forgiven" when MGM stock was sold in November 2019, (b) "Ms. Dondero was not competent to enter into the 2016 [] Agreement[s], (c) "[t]he [] Agreements were not authorized under the [LPA]," (d) the Agreements were "kept secret and were never disclosed," (e) "[n]o [d]ocument [e]xists that [r]eflects the [e]xistence or [t]erms of the [] Agreements," (f) the Agreements are "unenforceable for lack of consideration," (g) Dondero "fixed the terms of the [] Agreements without negotiation," (h) "Highland did not have a 'practice' of forgiving loans," (i)

Dondero's contention that he entered into the 2014 Agreement "contradicts HCMFA's Answer and was contrived at the last second," (j) NAM made prepayments under the Notes, and (k) "HCMFA's expert [Alan Johnson] has never advised a company to forgive an affiliate loan [as compensation]."[132] These are simply closing arguments that address the credibility of evidence and are properly made at trial, not at summary judgment.

### 1. James Dondero Not Declaring the Notes "Forgiven" upon the Sale of a Small portion of HCM's MGM Shares is Not Probative of Whether the Agreements Exist.

With respect to the later sale of MGM to Amazon, NAM did "declare" forgiveness. Mr. Dondero testified that NAM's financials reflecting the sale of MGM note the dispute regarding whether that sale affected the Notes' forgiveness.[133] That is, after the complete sale of MGM to Amazon, liquidating all of Appellee's interest in MGM, that event was recorded in NAM's books indicating that the "[N]otes were discharged due to a portfolio company sale[,]" but because there is active litigation, the Notes remain on the balance sheet.[134]

More importantly, Appellee is estopped from arguing that Dondero should have declared forgiveness after the November 2019 sale of a small number of MGM

---

[132] **ROA-69181-69187** at Section D.1.ii, throughout; *See also,* **ROA-75193-75201**, Section V.B.4, throughout.
[133] *See* **ROA-74973** at 27:21-28:4.
[134] *See* **ROA-74947** (NAM's April 2022 vs. March 2022 Balance Sheet).

shares. When – well after November 2019 – Appellants requested Appellee "[i]dentify any sale or potential sale of any portfolio companies (or a portion of such portfolio companies) owned (wholly or partially) by the [Appellees], including, but not limited to, Trussway, MGM and Cornerstone…," Appellee responded that it "ha[d] not sold Trussway, MGM or Cornerstone.…"[135] Appellee's answer makes clear that both sides understood that a qualifying sale needed to be all or substantially all of Highland's position.

### 2. Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence.

Appellee's representation that "there is a complete absence of *any* credible evidence supporting the existence" of the Agreements[136] is simply wrong, and easily refuted by Texas law.[137] James and Nancy Dondero's testimony is more than sufficient to show that the Agreements exist. Only *one* side to an oral agreement is required to testify as to its existence to survive a motion for summary judgment. "Where there is no written contract in evidence, and *one party* attests to a contractual

---

[135] **ROA-74877** at Interrogatory 14.

[136] **ROA-69193** at ¶ 116

[137] *See also* **ROA-75184** ("[N]o document or writing [] was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the [a]lleged [o]ral [a]greements.").

CORE/3522697.0002/185613231.17

agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact under Texas law."[138]

For example, in *Al-Saud*, plaintiff and defendant each provided conflicting summary judgment evidence regarding whether or not conditions existed that would allow the repayment and refund of a down payment to a loan at issue.[139] Because the summary judgment evidence – in that case, deposition testimony – was conflicting regarding whether or not those conditions (i.e.: an agreement) existed, summary judgment was denied.[140] Here, Appellants' summary judgment evidence creates a genuine issue of material fact, since they present testimony from ***both*** sides to the Agreements while Texas law only requires testimony from ***one***.

Further, "whether the parties had a meeting of the minds or common understanding is better suited for the trier of fact and cannot be determined by the court at this [summary judgment] juncture."[141] In *Fisher*, the movant argued on

---

[138] *In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005) (citing *Runnells v. Firestone*, 746 S.W.2d 845, 849 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (emphasis added); *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*, 480 S.W.2d 607, 610 (Tex. 1972); *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.—San Antonio 1997, no writ)).

[139] *Al-Saud v. Youtoo Media, L.P.*, 3:15-CV-3074-C, 2017 WL 3841197, at *4.

[140] *Id.*, at *6.

[141] *Fisher v. Blue Cross and Blue Shield of Tex., Inc.,* 3:10-CV-2652-L, 2015 WL 5603711 at 10 (N.D. Tex. Sept. 23, 2015) (analogizing the *In re Palms* in a summary judgment context: "[s]imply alleging there was no meeting of the minds is not a legitimate basis for summary judgment because "[w]hen there is no written contract in evidence, and ***one party*** attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact." (emphasis added)).

CORE/3522697.0002/185613231.17

summary judgment that no implied contract with the non-movant existed. However, the court denied summary judgment on the existence of an implied contract where the non-movant produced evidence of a course of conduct that "raised a genuine dispute of material fact as to whether the parties had an implied contract…"[142]

James and Nancy Dondero – the only two individuals who have firsthand knowledge of the Agreements – have testified numerous times that the Agreements occurred and do exist. Nancy Dondero testified to the Agreements' existence at her deposition,[143] and Dondero testified to the Agreements' existence at his May 28, 2021, deposition:

> Q:     Okay. And in the first sentence to your answer in Interrogatory 1, you wrote, or somebody wrote on your behalf, quote: "The agreements were entered into on behalf of the debtor by James Dondero, subsequent to the time each note was executed." Is that an accurate statement, or is it an inaccurate statement?"
>
> A:     Again, it was between me and the Class A, the majority of the Class A members. It was a Class A – the Class A members were representing Highland, never the debtor, because the debtor didn't exist yet.[144]

Dondero later **specifically affirmed the 2014 Agreement** at his May 5, 2022, deposition:

> Q:     Did you enter into the agreement with respect to the 2014 note both in your capacity as the president of Highland and

---

[142] *Id.* at 9-10.
[143] **ROA-71199** at 164:13-23.
[144] **ROA-70940** at 165:8-20.

> simultaneously in your capacity as the trustee of The Dugaboy Trust?
>
> A:      Yes.[145]

Appellee ignores this testimony in its Motion.  Moreover, Appellants provide the Dondero Declarations which explicitly assert that the Agreements exist.  Based on the evidence above, Mr. Dondero provides evidence that the Agreements exist and creates a genuine issue of material fact.[146]

Appellee seems to suggest that testimony from James and Nancy Dondero attesting to the Agreements' existence is insufficient to create an issue of material fact that the Agreements exist.  While this may be the case in one state with markedly different law than other states, this is not the case in Texas.[147]  In Texas, "[t]he existence of an oral contract may be proved by circumstantial evidence as well as by direct evidence."[148] In addition to the direct evidence provided by James and Nancy Dondero's deposition testimony and declarations, the circumstantial evidence supports the existence of the Agreements.  Appellee never demanded either of the Notes at issue in this case (nor did it declare any Term Notes to be in default) until

---

[145] *See* **ROA-74975** at 35:25-36:6.

[146] See, *Fisher* at 10.

[147] *See Franklin v. Regions Bank*, CV 5:16-1152, 2021 WL 867261, *4 (W.D. La. Mar. 8, 2021) (statutorily requiring corroborating evidence in addition to testimony from one party to prove an oral contract in excess of $500.00 in Louisiana).

[148] *271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*, 03-07-00498-CV, 2008 WL 2387630 at 4 (Tex. App.—Austin June 11, 2008, no pet.) (citing *PGP Gas Products, Inc. v. Reserve Equip., Inc.*, 667 S.W.2d 604, 607 (Tex. App.—Austin 1984, writ ref'd n.r.e.)).

CORE/3522697.0002/185613231.17

James Seery assumed control of Appellee.  Actually, it was not until Appellee was in bankruptcy that Appellee decided to conspicuously call all the demand notes for payment.[149] Prior to the bankruptcy, Appellee made no attempt to demand the Notes. It is strong circumstantial evidence that Appellee operated from 2014 to 2020 consistently with the Agreements being valid and in effect.

Appellee's argument that the evidence of the Agreements' existence is factually insufficient flies in the face of black letter law that the court cannot "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."[150] Because James and Nancy Dondero have sworn to the existence and validity of the Agreements, and Appellee acted consistently for years with the agreements being valid and in effect, Appellee's current arguments amount to nothing more than factual attacks that impermissibly require this Court to opine on the credibility of Appellants' evidence.

The Reports also relied on the fact that the Agreements were not disclosed to PwC, the accounting firm and auditor for Appellee.  Dondero did not disclose the Agreements to Appellee's auditors because such disclosure was unnecessary.[151] In light of Appellee's sizable financial assets, potential Note forgiveness under the

---

[149] **ROA-69164-69165** at ¶ 22 (referencing Plaintiff's demand on the Demand Notes); **ROA-69313** at ¶ 27; **ROA-69473** at ¶ 43.
[150] *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987).
[151] **ROA-74593** at ¶ 27.

CORE/3522697.0002/185613231.17

Agreements was *de minimis*.[152] Thus, Dondero did not think such a disclosure was material.[153] Moreover, whether the Agreements were disclosed to the financial auditors – or anyone else – has no bearing on whether the Agreements are legally enforceable.

### 3.     The Agreements Are Definite and Supported by Consideration and a Meeting of the Minds.

Appellee also argues that the Agreements are unenforceable due to a lack of consideration.[154] Specifically, Appellee asserts without analysis that "no reasonable trier of fact could find" that Appellee needed to retain or motivate Dondero or that Appellee received anything of value for the Agreements.[155]

But consideration "is a present exchange bargained for in return for a promise" that "may consist of *some* right, interest, or profit, or benefit that accrues to one party or of *some* forbearance, loss, or responsibility that is undertaken or incurred by the other party."[156]  Consideration consists of *either* a benefit to the promisor *or* a

---

[152] *Id.*

[153] *Id.*

[154] **ROA-69185** at ¶¶ 92-93.

[155] **ROA-69194** at ¶ 117.

[156] *Katy Int'l, Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 85 (Tex. App. 2014) (emphasis added) (citing *WCW Int'l, Inc. v. Broussard*, No. 14–12–00940–CV, 2014 WL 2700892, at *9 (Tex. App.- Mar. 4, 2014).

48

CORE/3522697.0002/185613231.17

Agreements was *de minimis*.[152] Thus, Dondero did not think such a disclosure was material.[153] Moreover, whether the Agreements were disclosed to the financial auditors – or anyone else – has no bearing on whether the Agreements are legally enforceable.

### 3.     The Agreements Are Definite and Supported by Consideration and a Meeting of the Minds.

Appellee also argues that the Agreements are unenforceable due to a lack of consideration.[154] Specifically, Appellee asserts without analysis that "no reasonable trier of fact could find" that Appellee needed to retain or motivate Dondero or that Appellee received anything of value for the Agreements.[155]

But consideration "is a present exchange bargained for in return for a promise" that "may consist of *some* right, interest, or profit, or benefit that accrues to one party or of *some* forbearance, loss, or responsibility that is undertaken or incurred by the other party."[156]  Consideration consists of *either* a benefit to the promisor *or* a

---

[152] *Id.*

[153] *Id.*

[154] **ROA-69185** at ¶¶ 92-93.

[155] **ROA-69194** at ¶ 117.

[156] *Katy Int'l, Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 85 (Tex. App. 2014) (emphasis added) (citing *WCW Int'l, Inc. v. Broussard*, No. 14–12–00940–CV, 2014 WL 2700892, at *9 (Tex. App.- Mar. 4, 2014).

CORE/3522697.0002/185613231.17

detriment to the promisee and thus, there is valid consideration when "when a party gives up a pre-existing legal right."[157]

Here, Dondero's forbearance from increasing his own compensation—a legal right he possessed prior to entering into the Agreements—as well as his contribution to increasing the value of all of the portfolio companies in efforts to sell the companies above cost, is adequate consideration for the Agreements. At the time the Agreements were formed, Dondero was authorized as General Partner of the Appellee to set his own compensation subject to approval by the Majority Interest.[158] Therefore, Dondero had a legal right to increase his own salary that existed before the Agreements were formed.[159] Accordingly, his decision to make part of his

---

[157] *See, e.g., 1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*, 584 S.W.3d 53, 65–66 (Tex. App. 2018); *Marx v. FDP, LP*, 474 S.W.3d 368, 378–79 (Tex. App. 2015) (cleaned up) (relinquishment of disputed claims against each other adequate consideration agreement granting purchaser option to purchase vendors' homestead); *First Com. Bank v. Palmer*, 226 S.W.3d 396, 398–99 (Tex. 2007) (guaranties executed in connection with renewal of promissory note to prevent payee from accelerating debt supported by consideration consisting of the payee's forbearance on prior guaranties and agreement to renew and extend the original debt); *Souther Equip. Sales, Inc. v. Ready Mix Sols., LLC*, No. 05-17-01176-CV, 2018 WL 3454801, at *5 (Tex. App. July 18, 2018) (extending time for payment of note or debt suffices as consideration); *Hoard v. McFarland*, 229 S.W. 687, 689-90 (Tex. App. 1921) (cancellation of vendor's lien note before expiration of limitations period was sufficient consideration for reconveyance), *writ refused* (June 7, 1922); *Brown v. Jackson*, 40 S.W. 162, 164 (Tex. Civ. App. 1897) (agreement by execution debtor with agent of execution creditor not to bid at execution sale was sufficient consideration for agent's promise to allow the debtor to redeem). *See also* 3 Williston on Contracts § 7:44 (4th ed. 2009) ("Just as a promisor may make an agreement for acts or promises to act, so too may it bargain for forbearances or promises to forbear."); 14 Tex. Jur. 3d Contracts § 157 (2024) ("Generally, forbearance from exercising a legal right, or the outright surrender of a legal right that one is not bound to surrender, is sufficient consideration for a contract or promise.").

[158] **ROA-69906** at § 3.10(a).

[159] *Id.*

compensation conditional upon his own performance instead of exercising his right under the LPA to increase the immediate cash component of his compensation provided adequate consideration in exchange for the Agreements. Dondero's testimony was clear that the Agreements served both to motivate his performance with heightened focus and to reduce other compensation Appellee would have otherwise had to pay him through an increased salary.[160]

Nancy Dondero believed that Dondero was undercompensated for the work that he did for the Debtor and undercompensated in comparison to other asset managers in similar industry roles.[161] In addition, Nancy Dondero agreed that Dondero's efforts to increase the value of any of the portfolio companies would cause them to be sold for the highest value possible.[162] Appellee's Motion fails to cite to any relevant authority to support failed or inadequate consideration.

Furthermore, "[i]n order for the consideration to be deemed inadequate, it must be *so grossly inadequate as to shock the conscience*, being tantamount to fraud."[163] Even if this Court finds that the Agreements were not made for precisely equal value, Dondero's conditional forbearance to increase his own pay and his

---

[160] **ROA-70944** at 182:2-18; **ROA-74885** at ¶ 13.

[161] **ROA-71206-71207** at 193:19-25-194:1-19; **ROA-71210-71211** at 206:17-25-207:1-17, 211:12-23; **ROA-71109-71110** at 51:8-13, 52:19-25-53:1-4; **ROA-71060** at 421:4-17; **ROA-71266** at 94:21-96:22.

[162] **ROA-71207** at 194:20-25-195:1-10; **ROA-71210** at 206:17-25-207:1-17.

[163] *Garcia v. Lumacorp, Inc.*, No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635, at *11 (N.D. Tex. July 27, 2004), *aff'd*, 429 F.3d 549 (5th Cir. 2005) (emphasis added, citations omitted).

specific dedication to increase his focus on the profitable sale of the portfolio companies is **not so inadequate as to shock the conscience**, particularly given that it is common practice in private companies to forgive bona fide debt in order to manage compensation and provide incentives to managers.[164]  Simply because Appellee disagrees with Mr. Dondero's assessment does not make the consideration "grossly inadequate;" it is an issue of fact for a jury precluding summary judgment.[165]

### 4. Nancy Dondero was Legally Competent to Cause Appellee to Enter into the Agreements.

The Reports again criticize the lack of first-hand information Nancy Dondero had about Appellee's business practices when she entered the Agreements.[166] The cited evidence has nothing to do with Nancy Dondero's competency to contract (as "competency" is understood under Texas law), but instead references random bits of information that Nancy Dondero allegedly lacked when she caused Appellee to enter into the Agreements. Although mislabeled, Appellee's argument – and the Bankruptcy Court's adoption thereof in its Reports – appears to be that the

---

[164] It was common practice in private companies to loan money that is bona fide debt and then forgive it over time to manage compensation and as incentives to managers of private companies. **ROA-71060** at 421:18-25; **ROA-52559-52560**.

[165] *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (determining that adequacy of consideration is a question of fact for the jury).

[166] *See* **ROA-75193-75195**.

CORE/3522697.0002/185613231.17

Agreements are unenforceable because they were the product of a unilateral mistake by Nancy Dondero.

Appellee and the Bankruptcy Court's position fails for several reasons. First, Texas law provides that Nancy Dondero is entitled to determine the information needed to decide whether to cause Appellee to enter into the Agreements, and the evidence confirms that she had what she needed.[167]

## C. The Bankruptcy Court's Conclusion that Nancy Dondero Did Not Have Authority to Bind Appellee Under the LPA is Inconsistent with the LPA.

The Reports' conclusion that Nancy Dondero did not have the authority to bind Appellee under Section 3.10(a) of the LPA not only lacks supporting legal authority, but is also an inaccurate reading of the LPA. The Bankruptcy Court opines that, because Section 3.10(a) gives the Majority Interest *approval* to act on behalf of Appellee, but is silent as to the *authority* to act upon such approval, then the Majority Interest cannot bind Appellee, claiming that "[a]pproval and authority are different concepts."[168] But § 3.10(a) places absolutely *no restrictions* on Dugaboy's authority to execute the same agreements it approves, nor does it distinguish between authority and approval.

---

[167] **ROA-74661-74662** at ¶¶ 9-11.
[168] **ROA-75195.**

CORE/3522697.0002/185613231.17

Texas law is clear on the interpretation of plain language in a contract such as the LPA, holding:

> Courts may not rewrite the parties' contract, nor should courts add to its language. [A Court] cannot make new contracts between the parties, and must enforce the contract as written. When the terms are *plain, definite, and unambiguous*, as they are here, the court cannot vary these terms.[169]

Appellee's argument – and the Reports' adoption thereof – makes nonsense of the words of the contract, asking this Court to alter or add to the plain language of the LPA, contrary to Texas law.

### D.    Appellee's Negligence and Fault in Creating an Alleged Default.

As demonstrated above, Appellee had the duty to make the required payment and failed to do so or even warn NexPoint, HCMS and NPREP of the consequences of creating a default. Thus there is admissible that Appellee's own negligence and fault caused the alleged default,[170] creating an issue of fact for trial.[171]

The Reports' conclusion that "no provision [of the SSA between NexPoint and Appellee] authorized or obligated [Appellee] to control NexPoint's bank accounts"[172] and/or authorized or obligated Appellee "to effectuate payments

---

[169] *In re Davenport*, 522 S.W.3d 452, 458 (Tex. 2017) (emphasis added).

[170] **ROA-73457** at § 6.01; *see generally* Section III.B *supra*.

[171] *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

[172] **ROA-7237** at n.30.

without instruction or direction from an authorized representative"[173] is contradicted by the record.[174]

Appellee also owed the same services to HCMS and NPREP as it did NexPoint pursuant to its verbal SSAs with HCMS and NPREP. Because the HCMS and NPREP SSAs carried with them the same obligations, rights, and duties as the NexPoint SSA, Appellee is also responsible for the skipped December 2020 annual payments. Therefore, there is sufficient summary judgment evidence creating a genuine issue of material fact that Appellee is responsible for these missed payments. Here, Appellee's motion – and the Reports – merely claim that "there was no admissible evidence that HCMS and HCRE [NPREP] had a shared service agreement with [Appellee]."[175] Accordingly, the Reports improperly either disregard or disbelieve the evidence of the shared services agreements between Appellee and HCMS and Appellee and NPREP.

### E. Prepayments by NexPoint and HCMS.

Appellee's motion denies the existence of any evidence supporting NexPoint and HCMS's ability to make prepayments under their notes and the Reports adopt

---

[173] *Id.*

[174] *See* Section III.B *supra.*

[175] **ROA-7237** at n.30.

54

that conclusion. However, there is abundant evidence to support NexPoint and HCMS's prepayment defenses.[176]

### 1. NexPoint Prepayments

In contradiction to Appellee's claim that the term Notes required payment precisely on December 31 of each year, NexPoint presented evidence showing a course of conduct wherein prepayments on the NexPoint Term Note were accepted by the Appellee on various dates without default in prior years. This Court cannot resolve this issue at the summary judgment stage, as it raises a genuine issue of material fact regarding NexPoint's defense of prepayment.

In Texas, the Court's primary goal when interpreting the NexPoint Note is to "determine the parties' intent as reflected in the [Note's] terms."[177] "An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning." [178] However, when a contract contains an ambiguity, "the courts [may] consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument."[179] Additionally, "[e]vidence of trade usage and **course of conduct** is admissible to explain, supplement, or qualify a term or an agreement, but it may not be used to

---

[176] *See* Section III.C *supra.*

[177] *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009).

[178] *DeWitt County Elec. Coop. Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999).

[179] *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

contradict an express term."[180] And more importantly, Texas law requires a lender to apply prepayments to upcoming installments absent express, contrary instructions.[181]

Here, the NexPoint Term Note itself is ambiguous with respect to the prepayment of future interest and the application of any prepayment between accrued interest, future interest, and principal. Section 2.1 of the Note provides:

> 2.1 <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"<u>Annual Installment</u>"**) until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.[182]

Section 3 of the Note further provides:

> 3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid

---

[180] *Craig Sessions M.D., P.A. v. TH Healthcare Ltd.* 412 S.W.3d 738, 745-46 (Tex. App. 2013) (emphasis added); s*ee also O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("the course of conduct of parties to any contract, is evidence of its meaning").

[181] *See Williams v. Cambridge Cos.*, 615 S.W.2d 172, 175 (Tex. 1981) ("Even in the absence of [instructions to apply a prepayment to the next installment], the prepayment was correctly applied to the installment first maturing."); *Getto v. Gray*, 627 S.W.2d 437, 440 (Tex. App. 1981) ("In the absence of an express stipulation to the contrary, prepayments on an indebtedness are to be applied to the installments first maturing."); *Bacher v. Maddux*, 550 S.W.2d 405, 405 (Tex. App. 1977) ("Where a party prepays note payments, these prepayments are applied to the installments first maturing."); *Curry v. O'Daniel*, 102 S.W.2d 481, 482 (Tex. App. 1937) ("Under these circumstances, the law will make the application according to the justice and equity of the case and this usually requires that such payment be applied according to priority of time—that is to the installments first maturing . . . .").

[182] **ROA-69326**.

accrued interest hereon, and then to unpaid principal hereof.[183]

The NexPoint Note does not require the annual payment on December 31 despite prepayment. In fact, the NexPoint Note contains *no* provision addressing whether prepayment will relieve the maker of any regularly scheduled payment. James Seery – testifying for Appellee – confirmed the absence of a provision preventing prepayment from relieving the maker from the obligation to make the prepaid payment.[184] Most importantly, NexPoint ***never made the full annual payment*** on December 31 in 2017, 2018, or 2019.[185] For example, NexPoint paid $294,695.10 on December 18, 2018.[186] NexPoint paid $530,112.36 on December 30, 2019.[187] Yet there were ***no defaults*** because, as explained below, NexPoint had prepaid the annual payment. Therefore, it is clear from the language of the NexPoint Note, the parties' understanding of the NexPoint Note, and the parties' course of conduct that the annual installment payment can be prepaid.

The ambiguity in the NexPoint Note is fairly straightforward: can NexPoint prepay future interest? The Note itself says that it can "prepay . . . accrued interest."[188] Accrued interest is of course interest that has already accrued, but the

---

[183] *Id.*

[184] **ROA-74691-74692** at 65:20-66:2 ("It's -- it says on, but typically there's no issue about prepayment and that paragraph 3 says you can prepay").

[185] **ROA-72531-72542**.

[186] *Id.*

[187] *Id.*

[188] **ROA-69326**.

Note expressly permits NexPoint to prepay this interest, in effect prepaying future interest. Yet the Note also provides that "payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof."[189] This provision forecloses the ability to prepay future interest, since any prepayment can only be applied to accrued interest and then to principal. This is the ambiguity in the Note itself: on the one hand, the Note expressly permits NexPoint to prepay future interest, while on the other hand, such prepayment appears impossible.

There is no question that the parties – well before this litigation – understood that NexPoint was permitted to prepay future interest. On May 9, 2018, NexPoint paid $879,927.65 on the Note.[190] The *entirety* of this payment was applied as a prepayment towards future interest for the months of May through October, 2018, and *none* of it was applied to principal.[191] Likewise, on December 5, 2017, NexPoint made a payment of which $127,030.67 was applied to future interest on the NexPoint Note, such that no payment was due – and no payment was made – on December 31, 2017.[192] Similarly, on December 18, 2018, $60,727.60 of NexPoint's payment was applied to future interest.[193] In addition to the parties' actual practice and conduct, Mr. Seery confirmed at his deposition that future interest can be prepaid under the

---

[189] *Id.*
[190] **ROA-72531-72542**.
[191] *Id.*
[192] *Id.*
[193] *Id.*

CORE/3522697.0002/185613231.17

NexPoint Note: "Interest accrues on this note. How you prepay it is you send the money before the accrual date."[194] Thus, NexPoint can prepay and has prepaid future interest under the Note, as evidenced by the parties' actual practice and Mr. Seery's testimony, regardless of Section 3's implication that prepaying future interest is impossible.

As noted, NexPoint prepaid the Note by $6,380,000.00 in 2019. Appellee clearly concluded that the 2019 annual principal payment on the Note had been prepaid because there was no such payment made on December 31, 2019.[195] But, Appellee billed NexPoint for $530,112.36 for accrued interest on December 30, 2019, which NexPoint paid.[196] This was the Appellee's error. In fact – as consistent with prior payments – the large prepayments in 2019 should have prepaid *future* annual instalments as there is no provision in the Note that links any prepayment to simply the annual payment for the year in which the prepayment is made; *i.e.*, nothing in the Note prevents a prepayment of annual instalments due in future years. In sum, when NexPoint paid $6,380,000.00 in 2019, those payments should have been applied to future annual installments in accordance with the parties' course of conduct and prior dealings.

---

[194] **ROA-74691** at 67:15-22.
[195] **ROA-72531-72542**.
[196] *Id.*

CORE/3522697.0002/185613231.17

Fortunately, Texas law addresses the situation where a debt instrument fails to specify how a payment should be applied against the underlying obligation. Generally, the debtor may direct the application of a payment in the absence of a written agreement providing otherwise.[197] "When a debtor fails to properly exercise his power to direct the application of the payment, the creditor ordinarily may apply the payment to any valid and subsisting claim he has against the debtor."[198] However, the creditor may "not make an application that is inequitable and unjust to the debtor."[199] This is a "limitation on the general rule that in the absence of application of payments by the parties themselves the law applies them to the oldest items then due."[200]

However, if neither the debtor not creditor make a proper application of a payment, then "the law will make the application according to the justice of the case."[201] Under Texas law, it can be presumed that the debtor intended to make the application in the manner that "would be most beneficial to him,"[202] which here would be to make the prepayment.

---

[197] *See Parrish v. Haynes*, 62 F.2d 105, 107 (5th Cir. 1932).

[198] *W.E. Grace Mfg. Co. v. Levin*, 506 S.W.2d 580, 585 (Tex. 1974).

[199] *First Nat'l Bank in Dallas v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974).

[200] *Id.*

[201] *Phillips v. Herdon*, 14 S.W. 857, 859 (Tex. 1890); *Accord Texas Co. v. Schram*, 93 S.W.2d 544, 548 (Tex. App. 1936).

[202] *Phillips*, 14 S.W. at 860.

CORE/3522697.0002/185613231.17

The Court cannot resolve these ambiguities and course of conduct issues on summary judgment. NexPoint intended that the payments in 2019 be applied as prepayments on the Note in 2019. Appellee agreed and understood this to be the case as well.[203] The only question is what the prepayments should be applied to and, in particular, whether they should have been applied to the 2020 annual installment. NexPoint did not expressly direct such prepayment. And, the Appellee did not apply the prepayments to the 2020 annual installment. Although the Appellee's application is to be given weight, it should not result in a manner that is "inequitable and unjust" to NexPoint. And, the ultimate application of the payments must be made in equity and under the facts and equities of the case, with the presumption that NexPoint "intended to apply [the prepayments] to the debt that would be most beneficial to [it]."[204]

## 2.    HCMS Prepayments

Similarly-situated to NexPoint, HCMS also presented evidence showing a course of conduct wherein Appellee consistently accepted prepayments prior to December 31 of a given calendar year for the HCMS Term Note, but never considered the Note to be in default when a payment was not made precisely on December 31.[205] Further, the allocation of HCMS's prepayments on the Note

---

[203] **ROA-72431** at 81:13-82:3.
[204] *Phillips*, 14 S.W. at 860.
[205] **ROA-74603**.

61

between principal and interest raise the same defensive issue of ambiguity as the NexPoint Note discussed in section III.C, *supra*.

The terms of the HCMS Term Note and the NexPoint Term Note are nearly identical, and therefore raise the same ambiguity issues.[206]

HCMS never made a single payment on December 31 of 2017, 2018, or 2019.[207] And, yet again, Appellee never called for payment or declared the HCMS Term Note to be in default in January – or any other month – of 2017, 2018, or 2019.[208] However – like NexPoint – HCMS made large payments on the Note in 2017, 2018, and 2019 that it believed applied towards future scheduled payments on the HCMS Term Note.[209] Specifically, HCMS paid $6,395,236.52 on the Note in 2017 ($5,395,319.15 more than the annual installment), $1,160,665.94 on the Note in 2018 ($160,748.57 more than the annual installment), and $7,230,360.49 on the Note in 2019 ($6,230,443.12 more than the annual installment).[210] Again, none of these payments were made on December 31, and at no time did Appellee declare the Note in default.[211]

---

[206] **ROA-69418**.

[207] **ROA-74603**.

[208] **ROA-74603**; **ROA-74600** at ¶ 46.

[209] *Id.*

[210] **ROA-74603**.

[211] **ROA-74600** at ¶ 46.

CORE/3522697.0002/185613231.17

Applying the same Texas precedent raised *supra*, the Court should look to the pattern of conduct between the parties to the instrument to determine how a contractual ambiguity should be resolved. Here – similarly to the NexPoint prepayments – Appellee accepted enormous prepayments by HCMS in the past, and never once raised the issue of default when it did not receive the annual installment payment on December 31.[212] Working off of this pattern of conduct, Appellee was not entitled to declare the Note in default. Again, however, the Court cannot resolve these ambiguities and course of conduct issues on summary judgment.

Additionally, even if there were any missed payments, payments were made on the NexPoint, NPREP, and HCMS Term Notes to cure any defaults. "An optional acceleration of maturity of a note can be waived by the acts and words of one who holds right of election."[213] As Appellants' evidence demonstrates, after learning about the alleged missed payments and talking with Waterhouse, Appellee's CFO, Dondero instructed him to make the payments and cure any default, and subsequently caused the payments to be made in January of 2021, payments that would not have been made if Mr. Waterhouse disagreed and told Dondero that the

---

[212] *Id.*

[213] *Vaughan v. Crown Plumbing & Sewer Serv., Inc.*, 523 S.W.2d 72, 75 (Tex. App. 1975) (citation removed).

payments would not cure and reinstate the loans.[214] Therefore, to the extent there was a default, it was cured.

### 3. The Reports Fail to Address the Issue of Prepayment.

The Reports fail to address the aforementioned arguments and evidence that prepayments were not only permitted, they were frequently made and acknowledged by Appellee in prior years. Instead, the Reports merely state that "the unrefuted summary judgment evidence of [Appellee] clearly dispels any argument that prepayments may have averted any defaults."[215] The Reports fail to describe how Appellee's summary judgment evidence "dispel[led]" Appellants' summary judgment evidence, and it is improper for the Bankruptcy Court to wholly disregard the non-movant's summary judgment evidence based on a credibility determination.[216] The Reports' only reference to Appellee's summary judgment evidence is a citation to the Klos Declaration. However, as stated above, the Klos Declaration does not even mention the HCMS Note. Therefore, it is unclear how the Klos Declaration could have "dispel[led]" Appellants' summary judgment evidence supporting their prepayment defense, especially with regard to the HCMS Note. Because both Appellee's motion and the Reports either ignored or improperly

---

[214] **ROA-74597-74598** at ¶ 40.

[215] **ROA-7236**, final paragraph.

[216] *See Heinsohn v. Carabin & Shaw, P.C.,* 832 F.3d 224, 245 (5th Cir. 2016); *Guzman v. Allstate Assurance Co.,* 18 F.4th 157, 160 (5th Cir. 2021).

CORE/3522697.0002/185613231.17

disregarded Appellants' summary judgment evidence, Appellee's motion for summary judgment should have been denied.

## F. There Were Genuine Issues of Material Fact Precluding Entry of Summary Judgment Against NAM.

### 1. Summary of NAM's Argument.

Appellee sued NAM on promissory notes, dated May 2, and May 3, 2019, totaling $7.4 million. NAM's primary defense is that these notes were executed, if at all, in error, in that they were created by lower-level employees of Appellee (with no authority to enter into the notes) to paper up transfers from Appellee to NAM that these employees mistakenly *assumed* were loans, but which were instead compensation to NAM for a costly mistake made by Appellee.

Additionally, NAM sought to argue that Waterhouse did not actually sign the notes—which fact came out near the end of discovery—yet the Bankruptcy Court declared the argument to be an affirmative defense, which it refused to permit NAM to assert. The Bankruptcy Court concluded that no reasonable jury could reach a verdict in NAM's favor, because both Appellee and NAM had seemingly informed third parties of the existence of the notes. However, the Bankruptcy Court missed the fundamental point that the same lower-level employees who created the notes would of course later record the existence of the notes and inform others of their existence, but that does not mean that the notes were ever authorized. Moreover, the

CORE/3522697.0002/185613231.17

bulk evidence cited by Bankruptcy Court concerned notes of different amounts and maturities, not the notes at issue here.

### 2. The Material Disputed Facts – and the Denial of the Motion to Amend.

#### a. Waterhouse Did Not Sign the Notes

In fact, Waterhouse did not actually sign the NAM notes—as indeed one would expect since the evidence demonstrated that those notes were not intended or authorized and were instead created by lower-level employees of Appellee in error. That Waterhouse did not sign the notes is incontrovertible; the only potential question of fact remaining—and one that is for a jury—is whether Waterhouse authorized Hendrix to electronically sign his name. This fact was not discovered until late in discovery, because Appellee hid this truth.

NAM timely served requests for production on Appellee that included a request for the original of the notes, including any related Metadata.[217] Appellee stalled.[218] When NAM deposed Waterhouse, Appellee still had not produced them,[219] and asserted it had no intention of doing so.[220] When, after further negotiation, however, Appellee finally produced the originals months after they had been requested, it was clear that Waterhouse had not signed the notes; rather,

---

[217] *See* **ROA-2476**.

[218] *See* **ROA-2482**.

[219] *See* **ROA-1855** at 146:12-17.

[220] *Id.*

Hendrix affixed a .jpg image of his signature.[221] Moreover, Waterhouse did not authorize Hendrix to sign his name; she admitted using a form promissory note, revising it, and saving the new note on the system without seeking or obtaining Waterhouse's authorization to sign his name and without sharing the completed notes with him.[222] Because NAM did not execute the notes because Waterhouse did not sign them, the notes are not valid under Texas law.[223]

After learning of the above and confirming it during the deposition of Hendrix, NAM filed a motion with the Bankruptcy Court to amend its answer to assert the defense that NAM did not execute the notes as required by Texas statute. Surprisingly, given the forgiving standard of Rule 15, the fact that Appellee had breached its discovery obligations, and the fact that no trial had yet been scheduled, the Bankruptcy Court denied that motion. NAM sought a review of the Bankruptcy Court's denial of that motion, which the District Court overruled via a one-sentence electronic order on July 6, 2023.[224] HCMFA incorporates its objection to the District Court's decision overruling NAM's objection. If the Court agrees with NAM's objection or concludes that the defense is not an affirmative defense, then the Court should reverse the summary judgment that was granted against NAM because there

---

[221] *See* **ROA-2536**; **ROA-2152-2154**.

[222] *See* **ROA-2148-2154**.

[223] *See* TEX. BUS. & COM. CODE § 3.401(a).

[224] *See* **ROA-1544-1548; ROA-20**.

CORE/3522697.0002/185613231.17

is: (i) no question of fact that NAM did not sign the notes; and (ii) the only possible question of fact is whether Waterhouse authorized Hendrix to electronically sign his name to the notes, on which question NAM introduced evidence that there was no such authorization given and on which Appellee offered no contradictory evidence, despite it being Appellee's burden.

### b. Waterhouse Lacked Authority to Execute the Notes

Another of NAM's defenses, one which is not subject to the denial of the motion to amend, is that Waterhouse, who purportedly signed the notes on behalf of NAM, was not authorized to do so or to bind NAM (going again to the fundamental, underlying mutual mistake because Waterhouse would not have purported to sign the notes as he knew that the transfers from Appellee to NAM were intended to be compensation and not loans). The Bankruptcy Court (and, subsequently, the District Court) denied this defense concluding that, as Waterhouse was an officer of both NAM and Appellee, he had the authority to execute the notes.[225] This was error as a matter of law.

First, there is no "apparent" authority, as there may be with a transaction involving a third party, since there is no "apparent" authority when the same individual is on both sides of the transaction and he knows that he lacks "actual"

---

[225] *See* **ROA-7235** at n.27.

authority.[226] Second, as both Waterhouse and Dondero confirmed, Waterhouse lacked the actual authority to bind NAM on loans of this size or to cause Appellee to lend funds of this size.[227]

The Bankruptcy Court (and, subsequently, the District Court) therefore erred as a matter of law in denying the defense that Waterhouse was not authorized to execute the NAM notes, since the fact that Waterhouse was an officer of NAM does not alone confer on him authority to bind NAM to $7.4 million of loan obligations. As there is evidence that Waterhouse lacked the authority to execute the notes, this is a question of fact that precludes summary judgment, especially when it is Appellee's burden to prove that Waterhouse had this authority.

### c. The NAM Notes Are the Result of a Mutual Mistake

If the Court proceeds to consider the NAM notes notwithstanding the fact that Waterhouse did not sign the notes or have the authority to do so, the Court should still reverse summary judgment because: NAM introduced significant, admissible

---

[226] *See* TEX. BUS. & COM. CODE § 3.402(a) (requiring corporate authority to execute promissory note on behalf of a company); *id.* at § 3.403 (providing that unauthorized signature is ineffective); *Kirkindoll v. NCUA Bd.*, Civil Action No. 3:11-CV-1921-D, 2015 U.S. Dist. LEXIS 47930, *26-28 (N.D. Tex. April 13, 2015) (discussing actual authority and apparent authority); *Gaines v. Kelly*, 235 S.W.3d 179, 183-84 (Tex. 2007) (holding that there can be no apparent authority where one knows of the lack of actual authority).

[227] *See* **ROA-39183** at 270:25-273:9. See *also* **ROA-43800-43801** at ¶¶ 2-3; **ROA-43803** at ¶ 9.

evidence demonstrating that the creation of the notes was the result of a mutual mistake, which is an issue of fact to be decided by a jury.[228]

The Bankruptcy Court concluded that, as both Appellee and NAM reported the fact of the notes to third parties, including in the bankruptcy case, no reasonable jury could conclude that the notes were the result of a mutual mistake. Here, however, the Bankruptcy Court ignored significant evidence otherwise and impermissibly made credibility determinations. Most significant to the Bankruptcy Court was that NAM, through Waterhouse, reported the existence of the notes to auditors and to the retail board of various funds NAM manages.[229]

But The Bankruptcy Court was wrong: HCMFA did not report the existence of the notes. Rather, what NAM reported was that "$12,286,000 remains outstanding to HCMLP [Appellee] from [NAM]. . . The earliest the Note between HCMLP [Appellee] and [NAM] could come due is in May 2021."[230] This is wrong: there was not one "Note," as reported; the amount of the notes is $7.4 million and not more than $12 million, and the notes are demand notes that are due on demand and not deferred until May, 2021.[231] Thus, instead of proving the absence of a mistake,

---

[228] *Breof BNK Texas, L.P. v. D.H. Hill Advisors, Inc.*, 370 S.W.3d 58, 66 (Tex. App. 2012); *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 409–10 (5th Cir. 2012); *Admiral Ins. Co. v. Armani*, No. 3:12-CV-105-N, 2012 WL 12885095, at *9 (N.D. Tex. Dec. 19, 2012).

[229] **ROA-34370-34371**.

[230] **ROA-7224**.

[231] *See* **ROA-7213-7214**.

CORE/3522697.0002/185613231.17

the evidence to which the Bankruptcy Court pointed confirms that there was a mistake because NAM was not referring to the notes in question but instead to a *different* note whose maturity had been extended.[232] The Bankruptcy Court missed this obvious point.

Likewise, the Bankruptcy Court's reliance on Appellee disclosing the notes in the bankruptcy case does not demonstrate the absence of a mutual mistake, at least not at the time of the purported execution of the notes, because Appellee did not specifically list the notes and listed the alleged liability of NAM in the wrong amounts.[233] The schedules, listing notes payable to Appellee, do not even name NAM.[234] They name "Affiliate Note Receivable-B $10,413,539.53" and "Affiliate Note Receivable-C $10,394,680.47," but even if one of these refers to NAM, again there is not *one* note and the amounts allegedly due do not match the notes in question.[235] Again, the Bankruptcy Court missed this obvious point.

Moreover, NAM introduced substantial evidence of the underlying mistake, that caused the transfer. NAM is a registered investment advisor that advises third-party funds.[236] At all relevant times, including from 2018 to present, NAM served as

---

[232] *See* **ROA-43804, 43841, 43844**.

[233] *See* **ROA-37880**.

[234] *See id.*

[235] *See id.*

[236] *See* **ROA-43801**.

advisor to Highland Global Allocation Fund.[237] At issue are two transactions involving equity interests in TerreStar Corporation that took place in March 2018.[238] In particular, an error occurred concerning the net asset value that was assigned to the TerreStar interests in connection with a March transactions (the "NAV Error").[239] The NAV Error is described in more detail in that certain April 7, 2019 Amended Memorandum regarding the Treatment of the TerreStar Corporation Equity NAV Error in the Fund.[240]

During this time, however, NAM did not perform its own valuation services.[241] Instead, NAM outsourced these and many other services to Appellee, and Appellee performed such services on NAM's behalf pursuant to the SSA.[242] Indeed, all of the "Adviser Representatives" involved in the NAV Error—including Thomas Surgent, Frank Waterhouse, Jason Post, and Lauren Thedford—were employees of Appellee, not NAM.[243] The Fund and NAM relied on Appellee to perform these services, and the NAV Error, including Appellee's involvement and responsibility, were material aspects of board conversations for over a year.[244]

---

[237] *See id.*

[238] *See id.*

[239] *See id.*

[240] *See* **ROA-43801, 43806-43816**.

[241] *See* **ROA-43802, 40108**.

[242] *See* **ROA-43802, 43817-43829, 40108**.

[243] *See* **ROA-43802, 43806**.

[244] *See* **ROA-43802**.

CORE/3522697.0002/185613231.17

As described in more detail in the May 28, 2019 *Memo regarding Resolution of the Fund's Net Asset Value Error*,[245] NAM ultimately made the fund whole through a $5,186,496 payment from NAM on February 15, 2019 and a $2,398,842 payment from HCMFA on May 2, 2019. Dondero, the President of both Appellee and NAM, was fully aware of these issues at the time.[246] Dondero believed and understood that Appellee was liable to NAM for causing or failing to prevent the NAV Error and that Appellee therefore needed to compensate NAM for its error.[247]

The purpose of the transfers from Appellee to NAM was therefore for Appellee to compensate NAM for the damages NAM paid in connection with the NAV Error; the transfers were not loans.[248] It was appropriate for Appellee to compensate NAM because Appellee's employees caused or failed to prevent the NAV Error and because of Appellee's duties under the SSA.[249] As Dondero testified,

---

[245] *See* **ROA-40045**.

[246] *See* **ROA-43800, 43802**.

[247] *See id*. at 3; Further, the Bankruptcy Court noted that NAM submitted an insurance claim for almost $5 million for the error, and received the insurance proceeds. This is irrelevant and does not change the fact of the Appellee's liability to NAM or, at most, creates an issue of fact. In Texas, the "collateral source" rule is an exception to the general principle that a plaintiff is limited to single recovery for a particular injury. "Long a part of the common law of Texas and other jurisdictions, the rule precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else — a collateral source. Thus, for example, insurance payments to or for a plaintiff are not credited to damages awarded against the defendant." *Haygood v. De Escabedo*, 356 S.W.3d 390, 394–95 (Tex. 2011). The Bankruptcy Court's reliance on the insurance payment as evidence to negate the evidence introduced before it is further evidence of its error because Texas law makes clear that Appellee remained liable to NAV for the NAV Error notwithstanding the payment of insurance proceeds.

[248] *See* **ROA-43802-43803, 40114**.

[249] *See* **ROA-43803**.

73

transferring these funds from Appellee to NAM to settle the fallout from the NAV Error was "a critical piece of putting the issue to bed."[250]

Specifically, Dondero instructed Waterhouse, the Debtor's Chief Financial Officer and NAM's Treasurer, to make the transfers.[251] He never instructed or suggested to Waterhouse that the transfers were loans nor to book them that way.[252] Waterhouse never asked Dondero whether the transfers were loans or should be drawn up as such.[253] Indeed, Dondero never said anything to cause Waterhouse to reach such an understanding.[254] Waterhouse testified that he does not recall Dondero instructing him to book the transfers as loans.[255] Dondero simply told Waterhouse to "go get the money from Highland."[256] At the same time, however, Waterhouse confirmed his understanding from his discussion with Dondero that the transfers were related to the NAV Error and resulting losses to NAM, thus further supporting Dondero's testimony and understanding that the transfers were compensation and not loans.[257]

---

[250] *See* **ROA-43803, 38901** at 92:25-93:4.

[251] *See* **ROA-43803**.

[252] *See id.*

[253] *See* **ROA-43803, 39195** at 319:3-6.

[254] *See* **ROA-43803** at ¶ 9.

[255] *See* **ROA-39151** at 145:3-6, **ROA-39186** at 284:4-6.

[256] *See* **ROA-39186** at 283:4-5, **ROA-39195** at 318:8-10.

[257] *See* **ROA-39151** at 145:3-12; **ROA-39183-39184**.

74

Appellee and NAM did not follow up with Dondero to ask whether the transfers were loans, and no one either at NAM or Appellee presented Dondero with promissory notes to sign or otherwise presented Dondero with any document to approve the notes.[258] If loans of $5 million and $2.4 million had been made, internal policies and procedures would have required the notes to go through Appellee's legal department, which was also providing legal services to NAM under the SSA, and ultimately through Dondero for his approval,[259] neither of which happened.[260] Indeed, Dondero was unaware of the Notes and had not seen them until just before this litigation commenced.[261] Nor could Waterhouse "recall specifically what amounts of money were moved when, for what purpose."[262]

NAM's corporate representative likewise testified that NAM was unaware of the notes until Appellee made its demand because it outsourced finance and corporate accounting functions to Appellee.[263] At the same time, NAM was unaware of any errors on its financial statements, again because it outsourced finance and corporate accounting functions to Appellee.[264] In fact, before the notes in question,

---

[258] *See* **ROA-43803**.

[259] *See* **ROA-39183**.

[260] *See* **ROA-43803; 39188** at 291:3-16; **ROA-39188-39189** at 293:18 - 296:7.

[261] *See* **ROA-43804**.

[262] *See* **ROA-39147** at 126:5-7.

[263] *See* **ROA-40090** at 38:3-9, **ROA-40091** at 42:23-43:3, **ROA-40094** at 55:12-18.

[264] *See* **ROA-40096** at 64:15-65:3.

CORE/3522697.0002/185613231.17

NAM issued two other promissory notes to Appellee, in similar amounts, the dates of collection on which were extended through May, 2021.[265] Thus, if Dondero, Waterhouse, or anyone else saw notes reflected on NAM's financial statements and being payable to Appellee, they would have naturally assumed that any reference to promissory notes referred to these prior two notes, not the notes in question.[266]

NAM's corporate representative also explained that the numbers do not add up:

> Q. As [NAM's] 30(b)(6) witness today, have you done anything to determine whether or not the $12.286 million number includes the principal amount of the notes?
> A. Looking at it, we can't tell. Because it doesn't line up exactly with those notes. There were other notes that had been recorded in the books for several years before. And if you add those two together, it doesn't add up. So it's not clear.[267]

Indeed, Appellee sued NAM to collect on the other two notes.[268]

To be clear, Dondero's intent, both as the person who controlled NAM and the person who controlled Appellee, and the only person who could authorize a loan of these sizes, was for these transfers ($5 million and $2.4 million) to constitute compensation from Appellee to NAM for the NAV Error, not loans—indeed, the numbers involved very closely match the sums paid out by NAM for the NAV

---

[265] *See* **ROA-43804, 43841, 43844**.

[266] *See* **ROA-43804**.

[267] *See* **ROA-40100** at 79:5-14.

[268] *See* **ROA-69418**.

CORE/3522697.0002/185613231.17

Error.[269] But, as Waterhouse informed Dondero in early May 2019, Appellee did not have sufficient funds to make these transfers.[270] Thus, Dondero personally paid most if not all of the $7.4 million into Appellee at or around the same time to enable Appellee to make the transfers to NAM, again under the belief and understanding that Appellee would use these funds to compensate NAM for the NAV Error, not to make a loan.[271] This is important. Since Dondero was initiating the funds that would ultimately flow through Appellee to NAM, then his understanding of the purpose of those transfers is controlling, in addition to the fact that the was the only person with authority to approve loans of this size, which he did not.

The deposition of David Klos—demonstrates how the mistake occurred. Klos was Appellee's controller,[272] and he instructed Hendrix to prepare the notes.[273] Klos discussed how funds would be transferred from one affiliated entity to another as needed for liquidity:

> Q.    And you joined Highland in 2009. From that point in time, 2009, through 2019, was there any practice at the enterprise of those businesses to transfer funds between each other on a basis of when one needed it and one had it?

---

[269] *See* **ROA-4380**4.

[270] *See id.*

[271] *See id.*

[272] *See* **ROA-40249** at 6:22-25.

[273] *See* **ROA-40264** at 68:4-13.

A.    Yes, that was a fairly, generally speaking, that was a fairly common practice, of using different entities within the overall structure to bridge liquidity.[274]

Klos also testified as to the standard practice that, where Appellee was transferring funds out, the transfer would be booked as a loan.[275]

Klos assumed that the underlying transfers were loans, but could not recall for certain.[276]

Hendrix, one of Appellee's accountants and not an employee of NAM,

likewise testified to the usual course when intercompany transfers occurred:

Typically, anytime specifically Jim Dondero would need to move money between related parties, he would pay down -- when I say him, he would have us in corporate accounting move money around, pay off notes, reissue new notes somewhere else. So a way to move money around between his entities.[277]

Stated differently, at that time "it's all one big happy family, and whoever needed

cash, the cash moved around."[278] As Hendrix testified when she received Klos'

instruction to paper the transfers as loans:

So is it fair to say that typically, obviously not every time, but typically your corporate accounting group when it would see intercompany transfers in large amounts would believe that they were loans?
MR. MORRIS: Objection to the form of the question.
THE WITNESS: Typically, they were loans. There's not really another way to get money from one entity to another. And if they were papered as a loan, that means we were told to set it up that way.[279]

---

[274] **ROA-40255** at 29:24-30:7.

[275] **ROA-40255-40256** at 32:20-34:5.

[276] **ROA-40265** at 69:1-70:14.

[277] **ROA-40198** at 21:10-16.

[278] *Id.* at 23:3-6.

[279] **ROA-40201** at 35:5-15.

CORE/3522697.0002/185613231.17

Hendrix testified that she believed that the $2.4 million Note was "related to a TerreStar NAV error" and the $5 million Note was for the "consent fee."[280] She testified further that she was never "told . . . directly" that the funds were a loan, but she [subject to objection] "assum[ed] that [it was a loan] based on many instances of intercompany transfers in the 14 years prior."[281]

The point is a simple one: when Appellee's accountants saw large transfers from the Appellee to an affiliate, in this case NAM, they simply assumed the transfers were loans and, pursuant to their historical practice, and as they did here, documented the transfers as loans. But, these employees had no authority or ability to bind NAM on any promissory notes. At the same time, both Waterhouse and Dondero confirmed that internal policies and procedures would have required Appellee's legal department, also providing legal services to NAM under the SSA, to review and approve the notes: "The internal policies and procedures at the Debtor and [NAM], as well as ordinary practice, required that loans in amounts such as $5 million and $2.4 million would go through the Debtor's legal department, which was also providing legal services to [NAM] under the SSA …."[282] Waterhouse likewise testified that "the team [accounting] would have worked with the legal group at

---

[280] **ROA-40202** at 38:17-39:5.

[281] **ROA-40202** at 40:20-25.

[282] *See* **ROA-43803**.

CORE/3522697.0002/185613231.17

Highland to draft any notes."[283] In fact, Waterhouse would have expected there to be a confirmation, represented by a box or section on a cover document, that "legal" has reviewed and approved the document before he would sign it.[284]

This was not done here. Hendrix, who testified that she prepared the notes and affixed Mr. Waterhouse's signature, testified that she did not obtain approval from the legal department.[285] In fact, and contrary to Waterhouse's testimony, she testified that it was not standard practice for the legal department to prepare and approve intercompany notes, but that this was handled instead by the accounting department using a prior template approved by the legal department.[286]

Waterhouse never instructed Klos to paper the transfers as loans; at least neither one of them remembered or was able to identify any such conversation or instruction.[287] Klos, assuming that the transfers were loans (but again, without any authority or instruction to document the transfers as loans), then instructed Hendrix to prepare promissory notes to reflect the transfers.[288] It was then Hendrix who

---

[283] *See* **ROA-39188** at 290:15-16.
[284] *See* **ROA-39189** at 294:16-22.
[285] *See* **ROA-40204** at 46:18-24.
[286] *See* **ROA-40197** at 18:1-19:13; 20:1-5.
[287] *See* **ROA-40265** at 69:11-15; **ROA-39188** at 290:4-293:11.
[288] *See* **ROA-37936**; **ROA-40200-40201** at 32:13-33:4).

80

actually prepared the notes.[289] The is no record evidence that Hendrix was authorized to do so.

In the end, the summary judgment evidence is that only Dondero could authorize the NAM notes, which he did not; his only instruction to Mr. Waterhouse was to transfer funds from Appellee to NAM to cover NAM's liability associated with the Nav Error. Waterhouse, in turn, simply instructed his team to transfer the funds, but did not instruct anyone to document the transfers as loans. Klos and Hendrix, two lower-level employees, simply assumed that the transfers were loans and unilaterally decided to document them as such, even though neither Dondero nor Waterhouse authorized them to do so. Hendrix then prepared the notes and affixed Waterhouse's electronic signature to them, without authority from Waterhouse, under the mistaken assumption that the transfers were loans.

## VI. CONCLUSION

For all of the reasons stated above, Appellants request that the Court reverse the District Court's order adopting the Reports and Recommendations by the Bankruptcy Court.

Respectfully submitted this 26th day of February, 2024,

---

[289] *See* **ROA-40203** at 42:15-43:20.

CORE/3522697.0002/185613231.17

By: */s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez, Esq.
Michael Aigen, Esq.
**STINSON LLP**
2200 Ross Avenue, Suite 2900
Dallas, TX 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

Davor Rukavina
Julian P. Vasek
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile

**ATTORNEYS FOR APPELLANTS**

CORE/3522697.0002/185613231.17

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(b) as amended by order dated, October 16, 2023, in that this brief contains 18,825 words, excluding parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, typeface Times New Roman, 14-point type (12-point for footnotes).


By: */s/ Deborah Deitsch-Perez*
      Deborah Deitsch-Perez


## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2024, the foregoing Motion was electronically filed using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.


By: */s/ Deborah Deitsch-Perez*
      Deborah Deitsch-Perez

CORE/3522697.0002/185613231.17